## A. & E. Wheelwright *against* J. & G. Depeyster.

THIS was an action of *trover,* for a quantity of *coffee.* The cause was tried at the *New-York* sittings, the 18th day of *April,* 1806, before Mr. Justice *Spencer.*

At the trial, the following facts appeared in evidence. The plaintiffs were owners of the schooner *Peggy* of *Newburyport,* and of a greater part of the cargo, consisting of coffee in hogsheads, barrels and bags, marked *S. P.* and they and the master were joint owners, of another part of the cargo, being five bags of coffee, without marks. The

Some coffee, belonging to American citizens, had been taken by a French privateer and carried into *St. Jago de Cuba,* and there sold provisionally by order of the French Agency established there, and afterwards condemned by a court of admiralty at *St. Domingo* upon a *process verbal* and proceedings at *St. Jago;* the goods having been purchased, *bona fide,* by *American* citizens of *Spanish* merchants at *St. Jago,* and brought to *New-York;* in an action of *trover,* brought by the *original* owner, it was held, that such a sale did not divest him of his property, and that he might recover it of the vendee.— The English law in regard to sales in *market-overt,* is not applicable in this state, where no such institution or usage exists. A *bona fide* purchase of goods without notice, or reference to the title of the vendor, does not, *of itself,* give an indefeasible title to the vendee.—Belligerents cannot establish prize courts in a neutral country; nor can they make any sale of their prizes there, unless authorised by treaty.—The property in goods captured cannot be transferred so as to divest the right of the original owner, unless by a sentence of condemnation by a court of competent jurisdiction. The court of the sovereign of the captor is the only competent tribunal to decide on the validity of captures. *Prize* courts proceed *in rem,* and cannot adjudicate on a prize lying in a foreign port, or out of the jurisdiction of the captor or his ally. Courts of *common law,* though they cannot inquire into the direct question of *prize,* may, in a question of property, decide whether the condemnation or sale has been made by a court of competent authority. One joint owner of a chattel may bring trover or trespass for his share or interest, and the defendant cannot take advantages at the trial, of the other partners or co-tenants not being joined, but must plead it in abatement.

ALBANY,
August, 1806.

Wheelwright
v.
Depeyster.

schooner had sold her outward cargo at *St Marks*, in the island of *St. Domingo*, in *January*, 1804, and took in her homeward cargo consisting chiefly of coffee, belonging to the plaintiffs and others. On her voyage homeward to the *United States*, she was captured, the 15th of *February*, 1804, by a *French* privateer and carried into *St. Jago de Cuba*, where she arrived the 1st of *March*. The coffee in question, was purchased on account of the defendants of a *Spanish* merchant, at *St. Jago de Cuba*, and the ship *Two Brothers*, in which it was brought to *New-York*, went alongside of the *Peggy*, and took it out of her. The coffee came into possession of the defendants with the rest of the cargo of the *Two Brothers*, in *May*, 1804, and a demand thereof was made by the plaintiffs on the 29th *May*, which was refused by the defendants. It further appeared, that the coffee in question, had been purchased by the plaintiffs at *St. Marks*, which all the time was in possession of negroes, under the government of *Dessalines*, and in a state of revolt from the *French* government. Great quantities of coffee are sold at *St. Jago de Cuba*, but chiefly prize coffee. The master and crew of the *Two Brothers*, when they took the coffee on board, had no knowledge of the plaintiff's claim ; but believed it to have been the property of the vendor there.

The defendants then offered in evidence, certain proceedings of the *agency* of the *French* government at *St. Jago de Cuba*, and the sentence of condemnation of the *Peggy* and her cargo, by a *French* admiralty court at *St. Domingo*. These documents were admitted to be duly authenticated, and contained the whole of the proceedings. The facts which they disclosed, were, that after a *process verbal* and examination of the master and mate, a survey of the *Peggy* was ordered by the *French agency* at *St. Jago de Cuba*, and it being reported that she was leaky, and her cargo in danger of being spoiled, it was ordered to be sold provisionally, and the proceeds to be deposited, to abide the final decision ; and the whole cargo was sold under such order, to a *Spanish* merchant there ; that, afterwards, on the 16th of *April*, subsequent to the sale of the coffee to the defendants,

.a sentence of condemnation was pronounced on the coffee at

St. Domingo, grounded on a *process verbal* drawn up at sea, and one at St. Jago de Cuba, by the French agent there, at the time the *Betsey* arrived as a prize, and on the examination of the master and mate. The cause of condemnation assigned, was a contravention of the *arrets* of the French government, as to the trade and intercourse with those parts of the island of St. Domingo, that were in possession of the negroes. This evidence was objected to by the plaintiffs, and was overruled by the judge. The defendants then offered to prove, that an agency of the French government for such purposes, was established at St. Jago de Cuba, by permission of Spain, with power to proceed in the manner stated ; but the judge overruled the testimony. It appeared in evidence, that, at that time, Spain was not at war with any power.

The judge charged the jury, that the property of the coffee remained in the plaintiffs, and had not been changed, either by the purchase made by the defendants, nor by any of the acts and proceedings of the captors, or the French tribunals ; that in ascertaining the damages, they ought to take into calculation, not only the coffee, exclusively owned by the plaintiffs, but a moiety of that part also, owned by them jointly with the master. The jury found a verdict for the plaintiffs accordingly.

The defendants moved for a new trial, on the following grounds. 1. That the property in the coffee became vested in the defendants by the purchase. 2. That prize goods may lawfully be sold by the captors in a neutral country, with the consent of the neutral power. 3. That a neutral power may lawfully permit a belligerent to bring prizes into its ports, and to proceed against them there for offences against the laws of neutrality. 4. That a prize carried into a neutral port, may be condemned while lying tl ·e, by the tribunals in the country of the captor. 5. That prizes may be sold previous to a condemnation, and a condemnation after such sale, by a court of competent jurisdiction, will divest the original owner of his property. 6. That the

ALBANY,
August, 1806.

Wheelwright
v.
Depeyster.

proceedings and condemnation in the present case, ought to have been received in evidence, as they were conclusive, and formed a complete defence in the cause. 7. That the present suit is a question of prize or no prize, and belongs, therefore, exclusively to the prize-courts. 8. That the judge misdirected the jury, as to the assessment of damages for the moiety of the coffee, which the plaintiffs owned jointly with the master.

*S. Jones and Hoffman*, for the defendants. By the purchase of the coffee at *St. Jago de Cuba*, the property was changed, and became vested in the defendants. It was purchased at a full price, of a *Spanish* merchant, in the usual course of trade, and without any knowledge of the rights of the plaintiffs. The doctrine of the *English* law as to sales in *market-overt*, is applicable to a case like the present. Every shop, by the custom of *London*, is considered as a *market-overt*, for such articles as the owner professes to trade in,* and sales there divest the rights of the original owner. Though we have not adopted the notion of sales in a *market-overt*, still the principle on which they are founded, the convenience and security of trade, is of equal force here. It seems, too, that, in *England*, a sale of goods in a shop, though not in *London*, if without fraud or suspicion, will change the property.† By the universal law of nations, prize goods may be sold in a neutral country, with the permission of the neutral power ; and such sale will divest the property of the original owner.‡ It may be more prudent, and more consistent with a rigid neutrality, for a neutral nation not to permit such sales by belligerents, within its territory; yet, if there be no existing treaty to the contrary, such a permission, on the general principles of the law of nations, may be lawfully granted.

In 1793, a *British* vessel, captured by a *French* frigate, was carried into *Charleston, S. C.* and sold there by the authority of the *French* consul, as a prize, at public auction.* Whether done by virtue of a treaty or not, makes no difference. The question is, whether it be consistent with the general law of nations, and the neutral government

* 2 *Blk. Comm.*
449. 2 *Coke's
Institutes,* 219.
220. 5 *Co.* 84.

† 2 *Comyn's Digest, Biens, D.* 3.

‡ *Bynkershoeck:
Questiones juris
publici, lib.* 1.
cap. 15. *Vattel, liv.* 3. ch. 7.
sec. 132. *Martens on captures,
recaptures, &c.*
sec. 36.

* *McMasters
v. Shoolbred.*
1 *Espinasse's
Cases,* 237.

has consented to the proceeding. It frequently becomes necessary, and admiralty courts do often direct, that the goods taken should be sold, prior to any adjudication as to the prize ; retaining the proceeds to abide the final decree of the court ; and this may be done in the neutral country into which the prize is carried. Here we offer a decree of condemnation to justify the provisional sale. Can it be denied, that a *bona fide* purchaser at such provisional sale of goods, would acquire a valid title to them ? The *English* high court of admiralty have recognised the legality of the sale, and even of the condemnation of goods, while lying in a neutral port.† That court has proceeded to adjudicate on prizes carried into the ports of *Lisbon* and *Leghorn*, and on depositions taken in those places. The same practice has been authorised by *Russia, France, Venice* and *Naples*. It may be said, perhaps, that prize-courts proceed *in rem*, and that the thing itself must be within its jurisdiction, before a decree of condemnation can be pronounced. This may be a rule of the *English* courts, but it does not appear to be a principle of the universal law of nations. The validity of the proceeding does not depend upon the thing's being within the jurisdiction of the court. Thus in the case of co-belligerents, an admiralty court at *Bourdeaux*, may decide on a prize lying at *Cadiz*, and so *vice versa*. The question is not whether a belligerent has a right to establish a prize-court in a neutral country : it is enough, that a prize-court at *St. Domingo*, proceeded, with the assent of the *Spanish* government at *St. Jago de Cuba*, to decide on a prize lying at the latter place. As it regards the transfer of property, the adjudication was as legal and valid, as if the vessel had been within the jurisdiction of the court. Whether it is a wise policy or not, for a neutral nation to allow any such proceedings within its territory, is a distinct question. If the neutral has the right to consent, and does consent, the proceedings are valid. If it could be legal in any case for a court of a belligerent nation to decide on property lying in a port of another country, it must be in the present case. *Spain* was in amity with the *United States*, and the ally of

ALBANY,
August, 1806.

Wheelright
v.
Depeyster.

† *Henrick and Maria,* 4 *Rob. Adm. Rep.* 43. *The Christopher,* 2 *Rob. Adm. Rep.* 209.

Wheelwright
v.
Depeyster.

*France ;* it was not the condemnation of one belligerent by another belligerent, but of a neutral or friendly vessel for a violation of the laws of trade. There is no danger of infringing the rights of belligerents in this case. Courts, too, are disposed to lean in favor of *bona fide* purchasers, and to intend that the decree under which the purchase has been made, was regular.* Again, these proceedings appearing to be regular, and the sentence of condemnation having been pronounced by a court of competent authority, its decision must be conclusive.†

* 4 *Rob. Adm.*
3. *The Helena.*

† 2 *East,* 473.
*Oddy* v. *Bovill.*

This being a question of prize, belongs properly to the district or admiralty court, and is not cognizable here.‡ All questions relative to property sold as prize, and in which the legality of the capture is litigated, belong exclusively to the admiralty court.§

‡ *Douglas,* 596.
*Le Caux* v.
*Eden,* and the authorities there cited, and the *notes.*
§ 2 *Brown's Civil and Adm. Law,* 219, 220.
3 *Term,* 323.
*Smart* v. *Wolf,* and *Livingston* v. *McKenzie,* in the note, 333.

[*The Court.* Do you mean that the district court of the *U. S.* has the exclusive cognizance of questions of this sort ?]

·Certainly. The plaintiffs here might have filed their libel in the district court, and the defendants have pleaded the purchase under the decree of the *French* court. This was done in the case of *Glass* v. *Sloop Betsey*.*

* 3 *Dallas,* 6.

[*Court.* But is this the time to raise the objection to jurisdiction, on a motion for a new trial ? Why did you not remove the cause into the court of the *United States ?*]

† 3 *Dallas,* 19.

In the case of *Bingham* v. *Cabot,*† the supreme court, on a writ of error from the *circuit court* for the district of *Massachusetts*, took up and considered the question of jurisdiction. So in the case of *Le Caux* v. *Eden,*‡ it was not considered necessary to plead this matter specially.

‡ *Douglas,* 596.

[*Livingston,* J. I recollect an action of *trover* brought here for goods condemned in *Georgia.*]

§ 2 *Saunders,* 259. 2 *Levinz,* 21. *Carthew,* 398.

There are some old cases§ in *England,* which seem to allow of actions in the common law courts, in regard to property condemned by an admiralty court; but there are cases also to the contrary. If a sheriff or carrier wrongfully sell the goods of another, he may be liable to the owner in trespass or trover ; but the property will be di-

vested by the sale, and may be held by a *bona fide* purchaser.*

*Harison* and *D. A. Ogden*, for the plaintiffs.   1. The rule or custom as to sales in *markets-overt*, which prevails in *England*, does not exist here.   There must be a market or *fair* created by *charter* or *prescription*.†   As to the sale in shops, it is confined to the city of *London*, and even there, it is not every shop that is considered as a *market-overt*.‡   This custom forms no part of the common law of this country; nor is it to be admitted, that every sale in the course of trade is valid.§   If this rule about sales in *open markets*, were general, it would be extremely mischievous, and open a wide door to frauds of every kind.   2. It is a settled principle, that nothing but a sentence of condemnation by a court of competent authority, can divest the original owner of his property.*   In the present case the proceedings at *St. Jago de Cuba* were a nullity.   Though some countries may have allowed such proceedings, they are not justified by any principle of the universal law of nations ; and if injurious to us, we ought not to adopt, or sanction the practice.   The cases cited from *Robinson's Reports*, are decisions founded on very special circumstances, and must be considered as exceptions at least, to the general rule.   Not an instance can be found of the establishment of an admiralty or prize-court in a foreign country.   Sir *William Scott* himself, lays down the contrary rule in the strongest terms.†   Indeed, it would lead to the most monstrous abuse, injustice and fraud, if it should be allowed that captured vessels might be carried into any part of the world, and there condemned, not by the regular court of the captor, or neutral country, but by a consul or agent of the belligerent.   If this may be done at *St. Jago de Cuba*, it may be done at *Canton*.   The neutral seeking redress must apply to the court taking cognizance of the prize, and put in his claim or appeal ; otherwise, he is forever precluded from any remedy or relief.   The sale under which the defendants claim, is very different from that ordered by a regular and competent court, before a condemnation.   Such order is a

ALBANY,
August, 1806.

Wheelwright
v.
Depeyster.

* *Brooke, Ab. tit. Trespass,* 256, 329, 359. *Strange,* 509. 2 *Jones,* 114. † 2 *Blk. Com.* 449.
‡ *Coke, 5 Rep.* 84.
§ *Harris* v. *Shaw, Cases, Temp. Hardw.* 349.

ᵞ *Flad Owen, Rob.* 135. *Brown's Civil and Adm. Law, vol.* 11. p. 255. 2 *Burrows,* 694. *Goss* v. *Withers*

† *Flad Oyen,* 1 *Rob.* 135. See also 8 *Term,* 268. 1 *Rob.* 119. *The Herstelder.*

ALBANY,
August, 1806.

Wheelwright
v.
Depeyster.

‡1 Shower, 135.

judicial act, and must issue from a competent court, but the order of a *French* agent at *St. Jago de Cuba* was illegal and void. If so, the right of the plaintiffs could not be divested by such sale, nor transferred to the defendants. In the case of *Nightingale* v. *Bridges*,‡ an action of trover was brought in *England* for goods taken and condemned by an *admiralty court* established on the coast of *Africa*, and the court in *England* held the seizure and proceeding illegal. The subsequent condemnation by the court at *St. Domingo*, cannot supply the defect in the title claimed by the defendant, under the sale at *St. Jago de Cuba*. He who purchases under an illegal sale, purchases at his peril. If a sheriff should, without authority, sell goods, and afterwards receive an execution against the property of the person whose goods he had sold, this would not render the prior sale valid.—— The sale at *St. Jago de Cuba*, was merely colourable, and a fraud on the neutral rights of this country. The assent of the *Spanish* government, does not render such conduct legal towards us. Our government has complained to the *Spanish* court for permitting such proceedings. In the case of the *Flad Oyen*, there was a tacit consent of the *Danish* government, but that was not thought to vary the case. 3. But it is said, that this is a question of prize, and belongs exclusively to the admiralty court. It is true, that the direct question of *prize*, cannot be decided by the courts of common law. A suit would lie against the captor, for an illegal capture, and if the captor came with his prize within the territory of the *United States*, the admiralty court would claim its right of jurisdiction. Where the principal inquiry is, whether a *prize* or not, it draws after it all incidental questions. But the question here, is, whether a court of competent jurisdiction has decided that point? If a competent court has decided on the question of prize, its decision is conclusive. There may be many cases in which the courts of common law, and admiralty courts have concurrent jurisdiction. In the case of *Hughes* v. *Cornelius*,* the jurisdiction of the court of K. B. to decide the question before them, was not doubted. In the case of *Glass* v. *The*

* Thos. Raym.
473. See also 1
Ld. Raym. 272.
Shermoulin v.
Sands. March,
110.

*Betsey*, (3 *Dallas*, 6.) the vessel was brought by the captors within our own port, as a *prize*, and the admiralty court was the proper *forum* to decide the question. In the case of *Bingham* v. *Cabot*,* the circumstances are so peculiar that it can have little bearing on this question. Purchasers under a sheriff's sale are no doubt protected ; but suppose he sell on an execution issuing from a court having no jurisdiction, would such sale be affirmed ? The question then recurs, was the court competent ? Again, a carrier has no authority to *sell* the goods delivered to him ; and the owner may maintain his action against the purchaser. The case cited from *Brooke*, cannot be law. If a butler entrusted with his master's plate, sell it, the owner may recover it of the person who buys it. The question is whether the vendor acts with or without authority ; and the purchaser buys at his peril. As to the five bags of coffee, jointly owned by the plaintiffs and master, it is sufficient to refer to the case of *Scott* v. *Godwin*,‡ in which the whole law on this point was considered, and by which it is clear, that one joint-tenant or merchant may sue alone, and if it is not pleaded in abatement, no advantage can be taken of it afterwards.

KENT, C. J. delivered the opinion of the court. This cause was very ably argued by the counsel, and the several points submitted, have received, as they merited, the attentive consideration of the court.

It was contended, that a *bona fide* purchase by the defendants at *St. Jago*, for a valuable consideration, and without notice, was equivalent to a purchase in *market-overt* under the English law. and bound the property against the party who had right. As no local law is alleged, or proved, this question must be governed by the general principles of the law of sales, which we are to presume, until the contrary be shown, are received and adopted in all commercial countries, at *St. Jago*, as well as at *New-York*. It was the maxim of the civil law that *nemo plus juris in alium transferre potest quam ipse habet* ; and this plain dictate of common sense is considered by *Pothier** and

ALBANY,
August, 1806,

Wheelwright
v.
Depeyster.

*3 *Dallas*, 19.

‡1 *Bos. and Puller*, 67, 76. See also 1 *Salk.* 290. 2 *Levinz*, 113. *Comberbach*, 367. *Skinner*, 640. 6 *Term*, 766.

* *Traite du contrat de vente*, part 1. n. 7.

ALBANY,
August, 1806.

Wheelwright
v.
Depeyster.

* Institute of
the law of
Scotland, vol.
2. 481.

*Erskine** as a fundamental doctrine of the contract of sale in *France* and *Scotland;* and there is good reason to conclude, that it prevails in most of the countries in *Europe*, which have felt the influence, or obeyed the precepts of the civil law. Lord *Kaimes*, in his *Historical Law Tracts*, tit. " *History of Property,*" vindicates this principle in the transfer of chattels, and observes, that when notions of property were slight, a *bona fide* purchase of stolen goods, gave a good title against the original owner ; but that in the progress of society, property acquired such stability and energy, as to affect the subject wherever found, and to exclude even an honest purchaser, when the title of his vendor was discovered to be defective. It was also a principle in the English common law, that a sale out of *market-overt* did not change the property against the rightful owner, and the custom of the city of *London*, which forms an exception to the general rule, has always been regarded and restricted by the courts, with unusual jealousy and vigilance. *(Comyn's Dig. tit. market E.)* The effect of such a purchase made here, is not strictly before us, but I have no difficulty in saying, that I know of no usage or regulation within this state, no *Saxon* institution of *markets-overt*, which controuls or interferes with the application of the common law. The purchase by the defendants did not, therefore, of itself, and without reference to the title of the vendor, give them an indefeasable right to the goods in question.

The original title of the plaintiffs to the coffee being made out upon the trial, and not contested here, we are next to inquire, whether the power and proceedings of the agent of the *French* government, established at *St. Jago*, were competent to authorise a sale of the coffee. This agency would appear to have been a *prize tribunal* with limited and provisional powers. There was a *process-verbal* received, and examinations taken by its authority, and a survey, sale and deposit of the proceeds ordered, and the agency is stated to have been established *for such purposes.*

It also appears, that at the time of bringing of the vessel into *St. Jago* as a *prize*, and at the time of the sale, *Spain* was a neutral power, and that there had not been any judicial condemnation of the cargo; but only an order of this agency for a provisional sale. I need not question a provisional sale in cases of necessity, under the orders of a competent court; but I deny the legality of the power exercised at *St. Jago*. The object of such tribunals in neutral ports, is probably to facilitate the sale, and increase the profits of prizes; but the object is not to be attained by such means. *Ausis talibus istis non jura subserviunt*. Neutral ports are not intended to be auxiliary to the operations of the parties at war, and the law of nations has very wisely ordained, that a prize-court of a belligerent captor cannot exercise jurisdiction in a neutral country. All such assumed authorities are unlawful and their acts void. This was so considered by the English court of admiralty in the case of the *Flad Owen*, (1 *Rob. adm.* 114.) and by the court of K. B. in the case of *Havelock v. Rockwood*. (3 *Term*, 268.) *Lampredi** lays down the same rule, by saying that the judgment of condemnation ought to be rendered out of the territory of the neutral power. The proper and regular court to condemn, says the highly respected and authoritative *Answer to the Prussian Memorial*, is the court of that state to which the captor belongs; and that questions of prize are, and can be, cognizable only in such courts, and, consequently, that the erecting foreign courts, or jurisdictions elsewhere, to take cognizance thereof, is contrary to the known practice of all nations. The Austrian ordinance of neutrality of the 7th of August, 1803, Art. 17. refers to and admits as valid, condemnations only by the judicial authorities of the countries of the captors; and the supreme court of the *United States*, in the case of *Glass* v. *The sloop Betsey*, (3 *Dallas*, 6.) declared, that no foreign power could of right institute any prize-court, or judicature of any kind, within the United States, unless warranted by treaty.

ALBANY,
August, 1806.

Wheelwright
v.
Depeyster.

‡ *De Commercio Neutrali, &c.* sec. 14. See also *Azuni's Maritime Law of Europe, vol. 2. p. 254.*

ALBANY,
August, 1806.

Wheelwright
v.
Depeyster.

From these cases, from the reason and fitness of the thing, and from the manifest inconvenience and abuse which would result to neutral rights, as well as to those of the powers at war, from the toleration of a contrary practice, I am satisfied, that the rule which I have stated is correct and just, and supported by the soundest authority. The proceedings of the French agency at *St. Jago* are, then, to be put out of view, as being *coram non judice*, and we are to consider the sale as made without any judicial sanction.

Such a naked sale by a captor even of property professedly belonging to an enemy, is void in law, and incapable of divesting the title of the original proprietor. It is requisite that a sentence of condemnation be given by a court of the sovereign of the captor, before a title to the prize can be transferred. This excellent rule has been long known and established in the English admiralty, as appears by the case of *Terremolin* v. *Sandys* ; (*Carth.* 423. 12 *Mod.* 143.) and it seems now to be equally recognized on the continent as part of the law and practice of nations. (The case of the *Flad Owen*, 1 *Rob.* 114. and of the *Henrick* and *Maria*, 4 *Rob.* 43. *Heinec. de nav. ob. vet. mer. veh. comm. sec.* 16. *Azuni's maritime law*, vol. 2. *p.* 242.) Our own government, also, adopted the rule during the revolutionary war, and bound itself to observe it. With respect to the capture of neutral vessels under the pretence of a violation of neutral duty, or of contravening the decrees of a foreign government, as was the instance in the case before us, the necessity of a previous trial and judgment is still more urgent and palpable, and that necessity is universally admitted.

We are next led to examine the effect of the sentence of condemnation at *St. Domingo*, subsequent to the sale at *St. Jago*. This sentence was intended to act retrospectively, and to cure all defects in the proceedings before the *French* agency, but it does not appear, and from the case we cannot, intend that the proceeds of the

sale under the order at *St. Jago* were deposited in any other place than *St. Jago*, and the admiralty at *St. Domingo* proceeded to exercise jurisdiction over the cargo and to adjudge it lawful prize, when the subject matter of their sentence was within the territory of a neutral power. An important and delicate question then arises, whether we are bound, in such cases, by the decision of a prize-court. Such a court acts *in rem* only, and it cannot exercise a competent or efficient authority unless it have possession of the subject. Possession must be essential to its jurisdiction. It is the duty of a prize-court to give a prompt and fair hearing to all parties, and to restore instantly, if upon a summary examination there does not appear sufficient ground to proceed. But how can this hearing be had, and this restoration made and inforced, when the subject matter in controversy, and perhaps the captors and captured, are in a foreign country? The admission of a practice so incompatible with the very constitution of a prize-court would lead to the greatest confusion. Suppose a foreign prize-court should sustain a libel against a vessel lying within one of our own harbours, and should proceed to try, condemn and sell the same, would any person hesitate to say that such a jurisdiction was inadmissible? that such a proceeding was *coram non judice?* To sustain jurisdiction in such a case would be the height of injustice and absurdity. The old rule, mentioned by *Bynkershoeck*, of allowing belligerents to carry their prizes into neutral ports, and to sell them there, was founded on the doctrine that bringing the prize *infra præsidia* did of itself work a transfer of title. But the alteration in the sense and practice of nations, by requiring a judicial condemnation before a change of title can take place, has done away the former indulgence, as incompatible with the new improvement; an improvement which has become an essential and most salutary controul over the exercise of the right of maritime capture. *Valin*, who published his commentaries in 1760, considered it then as

having become the law of nations, that prizes could not be carried into a neutral port, unless in cases of necessity, without a violation of neutrality, a d this prohibition was in one of the established ordinances of the marine. *(Ord. de la Marine. des Prises, art.* 14. *and Valin ibid.)* Among the regulations of congress upon this subject, in the year 1781, they acknowledged their obedience to the law of nations *according to the general usages of Europe ;* and they undoubtedly declared their understanding of those usages, when, in the same year, they ordered all prizes to be kept safe without sale, until they had been passed upon by a competent court, and that all prizes were to be brought for a judicial determination before a prize-court within the *United States,* or within the dominion of an ally of *America. (Journals of Congress, vol.* 7. 68, 18ᴼ.) The case cited from *March,* is interesting, inasmuch as it contains so early a recognition in *England,* of the modern rule, that a prize must be brought *infra præsidia* of the power by whose subject it was taken, or the property would not be altered, and the sale would be void.

　　Sir *William Scott,* in the case of the *Henrick & Maria,* *(4 Rob.* 43.) admitted, that upon principle, and according to the better opinion and practice, the prize ought to be brought within the ports of the sovereign of the captor, or within those of an ally of such sovereign, and that *possession founded the jurisdiction ;* but he observed, that the English admiralty had gone too far in sanctioning condemnations in *England,* of prizes abroad in a neutral port, to permit him to recall the vicious practice of the court to the acknowledged principle. We are, fortunately, under no such embarrassment in the present case ; and though precedents have controuled Sir *William Scott. ego tamen Scevolæ assentior ;*[*] and we are at liberty to consider the condemnation at *St. Domingo* as void, for want of jurisdiction in the court over the subject.

　　It has been strongly urged, that this court is concluded by the sentence, and has no authority to inquire

into its extent and force, because the question of prize and all questions incident thereto, belong to the exclusive cognizance of the admiralty courts. It is a sufficient answer to all this, to observe, that we are not inquiring into the question of prize. The plaintiffs prove a property in the coffee, and the defendants justify under a capture, condemnation and sale abroad but before the defence can be received, it must appear that the condemnation was by a court, having competent jurisdiction in the case, and so far we have, of necessity, an incidental jurisdiction. It wou d be a monstrous doctrine, to hold that we were concluded by every assumed authority. We are not to examine into the validity of the capture, but we must look so far as to see, whether the condemnation was by a tribunal competent to pronounce it in the given case, and if that is once ascertained, I agree that we must admit the defence to be conclusive. In the case of *Oddy* v. *Boville*, *(2 East*, 437.*)* a similar question arose, as to the legality of a *French* prize-court sitting in *Spain*, and no objection was raised as to the competency of the court of *K. B.* to sustain the inquiry ; and in the case of *Havelock* v. *Rock-wood*, the same court did not hesitate to declare, that the *French* court of admiralty at *Bergen* was illegal. It is the practice of the courts of law in cases of insurance, to reject the decisions of foreign prize-courts, if it appear, that they proceeded upon local ordinances, or on grounds contrary to the law of nations ; *( Mayne* v. *Walter*, *&* *Salouci* v. *Johnson*, cited in *Parke*, and admitted as valid in *Geyer* v. *Aquilar*, 7 *Term*, 696.*)* I cannot entertain a doubt, but that we have authority to inquire, and are bound to say, whether the foreign court was, by the law of nations, competent to pass the sentence in question, and having determined that it was not, that such sentence cannot avail in the present case.

The only remaining point in the case is, whether damages ought to have been assessed for the moiety of the coffee which belonged to the plaintiffs conjointly with the

ALBANY,
August, 1086.

master. This question admits of no difficulty. It ap=pears to be settled in the books, that in actions of trover and trespass, the plaintiff may sue separately for his aliquot share or proportion of interest in a chattel, and that the defendant may give the joint interest of others in evidence, in mitigation of damages, but that he cannot avail himself of the omission of the plaintiff, to unite the other tenants in common with him in the suit, otherwise than by pleading it in abatement. He cannot take advantage upon it at the trial. *(Skinner*, 640. 6 *Term*, 766. 7 *Term*, 280. 5 *East*, 420. 1 *Bos. &.Puller*, 70 to 75.*)*

The hardship of this case upon a *bona fide* purchaser, is calculated, upon the first impression, to strike the imagination. It was contended by the counsel, that such purchasers ought to have been favoured; but, as an *English* judge has somewhere observed, arguments upon the hardship of a case, are only quicksands in the law, which, if admitted, would soon choak and destroy all established principles. A steady adherence to rule in these cases, by requiring the purchaser of captured property, to look at his peril to the title, and to derive it under a competent sentence, will tend to check the intemperate avidity and irregular proceedings of belligerent captors.

The opinion of the court, therefore, is, that the defendants take nothing by their motion.

<div align="right">Judgment for the plaintiffs.</div>