Mowrey
v.
Walsh.

*MOWREY and others *against* WALSH.

Obtaining goods by a fraudulent purchase, the vendor delivering them with an intent to part with the property of the goods, in no case constitutes a larceny.

Though one obtain goods by a fraudulent purchase, void as to himself, yet if he afterwards sell them to a *bona fide* purchaser, without notice of the fraud, the property passes to the latter.

Yet they are not subject to be seised and sold on execution against the fraudulent vendee.

There is no such thing as a market overt in this state.

TROVER for cotton cloths: tried at the Washington circuit, November 14th, 1826, before WALWORTH, C. Judge

The case at the trial was briefly this: on the 16th of January, 1826, a person calling himself Samuel Stevens, came to the plaintiff's factory in Easton, Washington county, and presented a forged paper, purporting to be signed by Isaac Bishop, mentioning Stevens as a person who wished to purchase cotton goods, as one who might safely be trusted, and assuming to pay whatever amount the plaintiffs might supply him with. The plaintiffs' clerk sold to Stevens the cotton cloths in question, amounting to 172 dollars and 38 cents; and gave him a bill of the goods, which (goods) he took to Lansinburg the next day, and sold to the defendant, for considerable less than the prices charged at the factory. The defendant's clerk testified, however, that the price was a fair one. The plaintiffs afterwards demanded the goods of the defendant, who refused to surrender them; and the present action was brought.

The judge charged that the goods were obtained fraudulently, but not feloniously; and that if the defendant purchased them *bona fide*, and without notice of the fraud, (a matter which he left to the jury upon the evidence,) the plaintiffs could not recover.

Verdict for the defendant.

A motion was now made, in behalf of the plaintiffs, for a new trial.

*S. Stevens*, for the plaintiffs. The goods were obtained feloniously from the plaintiffs, who are, therefore, entitled to recover. (2 Russ. on Cr. 1390. 2 Mass. Rep. 106. 1 Leach, 108, 446. 2 id. 608. 6 Mod. 77. Hob. 138.)

But suppose the goods obtained fraudulently, and not feloniously. In neither case was any title acquired; and *the person obtaining them, having no title, could convey none

[*239]

to the defendant.   (1 John. Rep. 471. 1 Salk. 283. 1 Wils.   ALBANY,
                                                             Feb. 1828.
8, 9. 2 Str. 1187. *Tamplin & Co.* v. *Addy*, Sheriff of War-   ─────────
                                                              Mowrey
wickshire, cor. Ld. Ch. J. Best, at N. P.(*a*)        ·          v.
                                                              Walsh.

(*a*) A report of this case was furnished from the London Morning Herald,
of October 31st, 1826, as follows:

## COURT OF COMMON PLEAS—*Monday.*

TAMPLIN & CO. *v.* ADDY, Sheriff of Warwickshire.           ·

Mr. Sergeant Vaughan stated that this was an action brought by Messrs.
Tamplin & Co., who are extensive hemp and cloth manufacturers in Queen-
hithe, to recover from the defendant, late high sheriff of the county of War-
wick, £94, the amount of an execution levied by him under the following
circumstances: In April, 1824, a person of the name of Staunton, accompa-
nied by a youth whom he called his son, and another person, introduced him-
self at the counting-house of the plaintiffs, and represented himself as one
of the principal millers and flour dealers in Warwickshire, and said, as he
had an occasion for a large quantity of sacking in his business, he would be
happy to give them the preference of an order at that time.   The plaintiffs    °
thanked him for his preference, and they produced various samples of their
goods, from which Staunton selected as many as amounted to £94.   The
terms were arranged as cash, but Messrs. Tamplin & Co. could not think of
demanding money before the delivery of the article, and an order was given
to the clerk to forward them according to Staunton's directions.   The person
who accompanied Staunton was loud in commendation of his friend's wealth
and punctuality, and Staunton himself, on taking leave, begged to give a re-
ference to his very extensive correspondents, Messrs. Matthews & Co., of the
East India Chambers.   In consequence of this reference, the son of Tamplin
went to the East India Chambers, where he saw a large counting-house, and
in it laying a variety of new account books, and was answered by a person
there who called himself Mr. Matthews, as to Staunton's respectability.   That
person said his friend Staunton was a man of great business and of undoubt-
ed wealth, and recommended Mr. Tamplin to encourage his correspondence.
Mr. Staunton called in the course of the day on Messrs. Tamplin & Co., and
finding them satisfied with his reference, made some excuse about the pay-
ment of cash which he had promised, and produced a pocket-book, from which
he drew thirty bills of various amounts, and all accepted, and of short date.
He took care to exhibit them all, saying one was under and another above
the invoice, and then selected one for £95, which he said was so near the
amount, and was so close being due, that he was sure it would answer Messrs.
Tamplin & Co., as well as cash.   The bill purported to be the acceptance of
a Mr. Packwood, who, as described by Staunton, was a man of known wealth
at Worcester.   The plaintiff agreed to accept the bill, and Staunton then or-
dered the sacking to be sent to the Blossoms Inn, to be forwarded by Robin-
son's canal boat, directed "Mr. Staunton, Worcester," and the goods were

*H. P. Hunt*, contra.    The goods were not acquired by Stevens feloniously ; (1 Hal. P. C. 673 ; 1 Leach, 303, 467 ; 2 id. 614, 610 ; 2 East's P. C. 673 ; 2 Chit. Cr. L. 679 ; 7

accordingly so sent on the following morning.   Staunton, on going away, was waited on by the younger Mr. Tamplin, and in the gateway his son observed a pony belonging to Mr. Tamplin.   He immediately noticed its beauty, and requested his father to purchase it for him, which Staunton at first pretended to resist; but when the son pointed out how cheaply the pony might be kept by day, and turned out into a paddock at night, papa at length consented to buy it, which he did, and he gave another acceptance of a Mr. Brown for £29 for it, and a small quantity of canvass, which he spied out lying in a corner.   Staunton then expressed his anxiety to see young Mr. Tamplin at his house in the country, and informed him he should have the best guns, dogs, and horses, in Warwickshire at command.   Mr. Tamplin was so pleased with his correspondent, that he insisted on his coming into the house and taking some refreshment.   Staunton consented, after some pressing, and the wine which he got, appearing particularly to please, he purchased a pipe, which Mr. Tamplin chanced then to have in the docks, for £120.   Staunton then took his leave, having secured the sacking, the pony, the canvass in hand, and a pipe of port wine in prospect.   The next morning, however, Mr. Tamplin learnt something of his customer, which induced him to take possession of his pony, as it was on its road to Worcester, and to start to Birmingham in pursuit of his sacking.   His son went to the East India Chambers, from whence the firm of Matthews & Co. had vanished, not leaving even one of their new books at the counting-house.   Mr. Tamplin came up with his sacking at Birmingham ; but he found it then in the defendant's hands, under execution, at the suit of a creditor (understood to be a *bona fide* creditor) of Staunton's, of the name of Reynolds.   To recover the amount of his property, sold in virtue of that execution, the present action was brought.

Evidence of the facts above stated was given, and a person, dressed as a groom, of the name of Packworth, the acceptor of the bill for £95, was put into the box, who admitted that he was in the habit of accepting bills for Staunton, but who declined giving further evidence, witness being informed by the court that he was doing so at his own peril.

Mr. Sergeant Cross, for the defendant, contended that, however fraudulent or illegal the original transaction was, on the part of Staunton, his client, the high sheriff of Warwickshire could not be affected by it.   The plaintiff had the folly to sell his goods to a man, whom, if he had made the least inquiry, he would have found to be one of the greatest rascals in London.   The moment he parted with his goods, and delivered them over to Staunton's order, he relinquished possession of all property in them, and they became, in point of fact, the effects of Staunton, against whom any legal process, at the suit of a *bona fide* creditor of that person, must have been available.   As the delivery was made in town, at the Blossoms Inn, by Staunton's order, Mr. Tamplin could not avail himself of his right to stop

John. 200; 1 R. L. 410, s. 13;) and though they were ob-
tained fraudulently, and the purchase might be *void as to
him; yet he could convey a valid title to the defendant,
who purchased *bona fide* and without notice. 2 Bl. Com.
448; 2 T. R. 750; 5 T. R. 175; 1 John. 471; 12 John.

So far as he was concerned, the moment they reached the Blossoms Inn, in London, they were no longer *in transitu*. The learned sergeant also contended that, setting aside the question of the plaintiff's right in the goods, his client had not been charged in possession of the goods, with the produce of their sale, by sufficiently legal evidence. The officer who was produced, neither held the warrant, nor could he bring home the possession of it to the defendant. As the high sheriff, in actions of this nature, could only be affected by a case when strict legal evidence was brought forward, he relied confidently on a verdict, from the very imperfect nature of the testimony now produced.

Lord Chief Justice Best said, in this action of trover against the high sheriff of Warwick, the plaintiff seeks to recover goods which he says were his, and which were taken away from him by fraud, and which were sold by the defendant under execution, at the suit of creditors of Staunton, the person who took them away from him. There is no principle of law more firmly established than this, which declares that no property passes by a fraud. Could the jury doubt that the goods in this case were not obtained by so gross a fraud, that the parties implicated in it were subject to transportation for seven years? If, therefore, the jury thought that the goods had been thus obtained, the right remained in the original owner, no matter into whose hands they found their way, and he, the plaintiff, was entitled to a verdict. Another question was, however, set up. It was said that even supposing the goods to be stolen, and the property still remaining in the plaintiff, still there was no legal evidence to bring possession home to the sheriff, and fix him in the present case. But he was bound to say, that there was sufficient evidence for that purpose. As the warrant itself could not be got hold of, parol evidence was given of its existence. The officer proved having received it in the usual course, and having returned it in the same manner to the said sheriff. The officer said that if he had not returned it, a complaint would have been made of his neglect; and as there was no such complaint made, it was a fair inference to be taken in corroboration of his own testimony, that he performed his duty according to the customary mode. From experience he knew how difficult it was to collect evidence in actions against sheriffs. You are left to poke your way in the dark; and the officers are very dexterous in shutting out every light that may assist you. The officers had a strong itching at all times to protect the sheriff; and even in cases where the sheriff was willing and anxious to do justice. officers were not ready to assist him. He thought the plaintiff entitled to a verdict, not only from his inherent right in the property, but also from the manner in which he brought the execution of the distress home to the sheriff.

The jury found a verdict for the plaintiff."

ALBANY,  348; 6 Cowen, 114; 14 John. 415, per Thompson, C. J.; 7
Feb. 1828.
——————  Taunt. 59.
Mowrey
v.
Walsh.     *Curia, per SAVAGE, Ch. J.   It seemed to be conceded
upon the argument, that if the goods were taken feloni-
ously, *no title passed from the vendors; and they might
pursue and take their goods wherever found.  Such is the
law in England, unless the stolen goods are sold fairly in
market overt.  2 Bl. Com. 449.  And as we have, in this
state, no such market, (1 John. 471,) sales here can have
no other effect than mere private sales in England.  It fol-
lows that, in this state, any sale of stolen goods does not
divest the title of the owner.

[*242]     *It is proper, therefore, to inquire whether the goods in
question were feloniously taken.

Larceny is defined, by East, to be the wrongful, or fraud-
ulent taking or carrying away by any person, of the mere
personal goods of another, from any place, with a felonious
intent to convert them to his (the taker's) own use, and
make them his own property, without the consent of the
owner.  2 East's P. C. 553.  It is, therefore, important, in
cases of delivery of possession by the owner, to inquire
whether he intended to part with the possession or with the
property; for if the latter, by whatever fraudulent means
he was induced to give the credit, it cannot be felony.  2
East's P. C. 668.

It cannot be necessary to refer to the various cases of
bailment, or of fraudulent practices to obtain possession of
property.  I will cite a few, to show that when the pro-
perty is intended to be transferred, no larceny is committed
however great may be the fraud.  In Rex v. Harvey, (2
East's P. C. 669,) the prisoner agreed to give £8 for a horse,
which was delivered to him on his promise to pay imme-
diately.  He mounted the horse and rode off.  This was
held no larceny.

Rex v. John Parks, and Rex v. Catharine Coleman, (2
East's P. C. 671, 672,) were also cases of fraudulent sale
and delivery, which were held no larceny.  Rex v. Atkinson,
(id. 673,) was somewhat like this case.  The prisoner sent

a third person to the prosecutor, with a *forged letter purporting to be written by one Broad, requesting the loan of £3 for a few days. The money was sent and delivered to the prisoner. After conviction, all the judges held, that this was no felony, on the ground that the property was intended to pass by the delivery of the owner. *Commonwealth* v. *Kingsbury,* (5 Mass. Rep. 106,) was not a case of sale. See also 3 Chit. Cr. Law, 921.

The delivery of the goods in question to Stevens, was clearly intended as an absolute sale. It was not, therefore, a case of larceny.

The jury have found that the goods were fairly purchased by the defendant of Stevens, without any notice of the fraud; and in my opinion the testimony fully warrants their finding.

The question then arises, upon a case where the goods are obtained by fraud from the true owner, and fairly purchased of, and the price paid to the fraudulent vendee, without notice, by a stranger, which is to sustain the loss, the owner or the stranger?

*Hartop* v. *Hoare,* (1 Wils. 8; 2 Str. 1187, S. C.,) was a case of bailment, not a sale; and the court expressly say, that the plaintiff's delivery was a naked bailment of the goods to his own use, and there was no authority given afterwards, to dispose of them; so that Seymour's (the bailee) breaking the seal, made him a trespasser as to Hartop. *Wheelwright* v. *Depeyster,* (1 John. 471,) was not a case of sale or delivery by the owner. The property in question was seized tortiously on the ocean; and no act done to divest the title of the owner.

The case of *M'Combie* v. *Davies,* (6 East, 538,) is not in point. The principle of that case is, that a person receiving in pawn from a broker, the property of his principal, is liable in trover to the principal, after demand and refusal; but it has no application to a case of sale by the principal to a fraudulent vendee. So the case of *Kinder* v. *Shaw,* (2 Mass. Rep. 398,) decides that a factor cannot pledge the goods of his principal. But that class of cases have no application.

*Parker v. Patrick, (5 T. R. 175,) seems to be in point for the defendant. In that case, goods had been fraudulently obtained from the defendant, and pawned, for a valuable consideration and without notice to the plaintiff. After conviction of the offender, the defendant obtained possession of his goods, but by what means does not appear. It was contended that the plaintiff, the innocent pawnee, could not recover; as he derived title through a fraud, and was like a person deriving title from a felon. But Lord Kenyon thought the cases distinguishable; and the plaintiff had a verdict. A motion to set aside this verdict was refused; the court saying that the statute of 21 H. 8, ch. 21, did not extend to the case of goods obtained by fraud, but only to a felonious taking of them. By that statute, the owner of stolen goods is entitled to restitution, on conviction of the felon. But as that statute did not apply to a fraudulent obtaining of goods, the owner was not entitled to restitution. The question, then, was purely at common law; and the innocent pawnee was allowed to recover against the owner, whose goods had been obtained from him by fraud. According to that decision, had the plaintiffs in this case succeeded in getting their goods in any other way than by voluntary delivery from the defendant, he would be entitled to recover against them. The same principle was adopted by this court in M'Carty v. Vickery, (12 John. 348,) where it was decided, that after a delivery of goods sold, the vendor cannot bring trespass, although the sale was procured by fraud. The court say the property was changed.

Hollingsworth v. Napier, (3 Caines, 182,) was like Parker v. Patrick. The defendant had sold the cotton to Kinworthy for cash, payable on delivery. The defendant, in fact, delivered it by giving an order on the store-keeper without receiving payment. Kinworthy sold it bona fide to the plaintiff, though there were some suspicious circumstances. The plaintiff took possession, and the defendant afterwards took and sold it. The plaintiff recovered a verdict; and this court refused to set it aside. *Kinworthy's purchase was palpably fraudulent, and so considered by the court.

[*245]

The plaintiff's counsel relies on a case lately tried in the English common pleas: *Tamplin* v. *Addy*, sheriff of Warwickshire. In that case, goods were fraudulently purchased of the plaintiffs by one Staunton. After the delivery of the goods to Staunton, they were levied on by the defendant under an execution, and sold. Best, Ch. J., does indeed lay down the broad proposition, that if the goods were obtained by fraud, the right remained in the original owner, no matter into whose hands they found their way. That proposition was advanced at *nisi prius;* but is certainly at variance with settled principles of law.

It is, no doubt, true, if confined to the parties in the fraud. But it does not extend to an innocent purchaser. Perhaps, too, it may be correct in the particular case. The judgment creditor had not advanced money upon these goods, and his loss placed him in no worse situation than he was in before the fraud. But surely, in point of equity, there is a great difference between the fraudulent purchaser and an innocent one. The case of *Noble* v. *Adams,* (7 Taunt. 59,) decides, that between the parties, a fraudulent purchase gives no title; but the case of *Parker* v. *Patrick* was admitted to be good law by the counsel for the party defrauded.

The case of *Bristol* v. *Wilsmore,* (1 B. & C. 514,) was not cited on the argument; but it is in point to show the true principle which supports the *nisi prius* decision of Ch. J. Best. The principle is this; that the fraudulent purchaser having no title, and the sheriff having no power to seize and sell anything but the title of such purchaser, the sheriff's sale did not divest the title of the true owner, the defendant in the execution having no right or title to be sold. And see *Van Cleef* v. *Fleet,* (15 John. 147.)

On the whole, therefore, I am of opinion that the innocent purchaser for valuable consideration must be protected; and the motion for a new trial must be denied.

New trial denied.