67 U.S. 372 (____)
2 Black 372
CALAIS STEAMBOAT CO.,
v.
SCUDDER, ADM'R OF VAN PELT.
Supreme Court of United States.

*373 Mr. Curtis and Mr. Hutchins of Massachusetts, for appellant.
Mr. Shepley, of Maine, for appellee.
Mr. Justice NELSON.
This is an appeal from a decree of the Circuit Court of the United States, for the District of Maine.
The bill was filed in the Court below by Scudder, the administrator of John Van Pelt, deceased, against the Steamboat Company, claiming title to thirteen-twentieths of the Steamer Adelaide, as belonging to the estate of his intestate, and a consequence of this interest to the complainant, an account of her earnings, &c.
The respondent set up, by way of defense, title to the whole of the steamer as bona fide purchasers and for full value from one William W. Vanderbilt, in the city of New York.
The case discloses that John Van Pelt, a resident of California, in the spring of 1853, employed Vanderbilt, an engineer and constructor of steamers, to visit the city of New York and there enter into contracts, and superintend the construction of the steamer in question, he, Van Pelt, furnishing the necessary means for the purpose. The contracts were to be made in the name of Vanderbilt, the builders' certificate to be taken and the enrolment, at the custom-house, made in his name as owner. This instruction was given by Van Pelt to Vanderbilt for the avowed purpose of concealing his own name in the construction of the vessel, as, for reasons not material to state, he did not wish it to be known in the city of New York, or in California, that he was interested in her. He was very specific and urgent on this point; for, in one of his last letters to Vanderbilt, written at his request, 13th September, 1853, (he died on the 29th,) he says, "You are not to know that he (Van Pelt) has any interest in the boat; and, that you must be more particular in talking and writing about her and her destination."
The boat was built in New York in pursuance of this authority and these instructions. The contracts were entered *374 into for the hull and engines in July, 1853; for joiner-work painting, &c., at a later date. All made in the name of Vanderbilt. She was finished in September, 1854. In the latter part of August of the same year, two agents of the respondents visited the city of New York for the purpose of buying a steamboat to be put on their line of steamers in the place of one disabled, and saw or had seen the steamer in question advertised in the daily city papers for sale. And, on application to Vanderbilt, and after examination of the vessel and the usual negotiations as to price, on the third of August the purchase was made for the sum of $88,000  $5,000 paid down, $15,000 23d August, and the balance 9th September. Vanderbilt, after having procured the usual builder's certificate, to which he was entitled as contractor for the building of the vessel, had her enrolled in his own name as owner; and then, on the 9th September, executed a bill of sale to the purchasers, under whom the respondents claim title.
Upon this simple statement of the case, it is not to be doubted but that the legal title to this vessel passed to the purchasers; for, although as between Vanderbilt and Van Pelt, his principal, or the estate of Van Pelt, the legal title could not avail, beyond a lien for his services or for any advances; yet, as it respects third persons, who have bought in good faith and for a valuable consideration, the rule is different. The question then arises between two innocent parties, and the equity of the case turns against the party who has enabled his agent or any other person to hold himself forth to the world as having not only possession, but the usual documentary evidence of property in the article. 3 B. & Cr., 38; 4 D. & A., S. C; 8 Cow., 238.
The case furnishes a very strong illustration of this principle. All the indicia of property in this vessel in Vanderbilt existed from no fault of his, for he was clothed with it by the express authority of the principal. Van Pelt, therefore, took upon himself knowingly the responsibility of vesting the property of the vessel in Vanderbilt, as he must have known that it was in his power to deal with it as owner. Besides, he was extensively engaged in the business of steamboats in the waters of California. *375 and doubtless understood, in point of fact, the responsibility he was assuming. Van Pelt died in September, 1853, while this vessel was under contract for construction. The event, however, did not interfere with it, as his legal representatives continued the arrangement the same after as before  furnishing the necessary funds, and carrying on the work till the vessel was finished. They took the place of Van Pelt.
In order to weaken this view of the case, it is said that Van Pelt, before his death, changed the agency of Vanderbilt by the appointment of one D.P. Vail. If this were conceded, unless it had the effect to change the apparent ownership of the vessel in Vanderbilt, the circumstances would be immaterial. No secret arrangements between the parties could affect third persons. But there was no change in the instructions to Vanderbilt of any importance in the case. The authority of Vail was confined to the furnishing of the vessel after she was finished, and to the taking charge of her as Captain in carrying her to California. The funds furnished by the owners passed through his hands to Vanderbilt. In one of the last letters written by Van Pelt, 1st September, 1853, to Vanderbilt, before his death, he says  speaking of the vessel  "I wish the bill of sale to be made for D.P. Vail, ten-twentieths; R. Chenery, four-twentieths; R.M. Jessup, three-twentieths; W.W. Vanderbilt, two-twentieths; and Frank Johnson, one-twentieth."
These instructions to Vanderbilt related to his disposition of the vessel after her completion, the names and shares representing the owners, and their interest. The ten-twentieths in Vail's name represented the interest of Van Pelt, and was placed there to conceal his interest agreeably to his original purpose.
These instructions, whatever may have been their effect upon the parties concerned, had none as it respected the apparent relation of Vanderbilt to the vessel. He remained in possession of her and of all the documentary evidence of property, and was thus held out to the world as the legal owner. Indeed, no change was contemplated in this letter till the boat was finished. Van derbilt then was to give a bill of sale to the persons named, Van Pelt's interest still to be concealed. We lay out of the case, *376 therefore, all the evidence in respect to the connection of Vail with the construction of the vessel, as in no way affecting the ostensible ownership of her by Vanderbilt.
It is insisted, however, that, assuming the respondents obtained the legal title of the vessel by the purchase and bill of sale of Vanderbilt, still the title was defective, inasmuch as they are chargeable with notice of the equitable interest of the estate of Van Pelt. This, in our view of the case, is the only serious question in it.
It is admitted that the respondents paid the full value of the vessel at the time of the purchase  $88,000. They had no motive, therefore, to make the purchase of a vessel of doubtful or defective title. So far as regards the contract of purchase itself, its terms and conditions, there is nothing inconsistent with the most entire good faith. If the vessel had been purchased under her value, or the mode of payment had been prejudicial to the vendor, or any special gain had been achieved by the purchasers, the Court would necessarily approach this question of notice with very different impressions from those proper in this case. Down to this point, the evidence of good faith is undeniable, and must be overcome by the proofs of the adverse party. We go one step further; with such evidence of good faith from the terms and conditions of the contract itself, the proofs to overcome it should be more full and direct, more unequivocal and certain than in the case of a like impeachment of a hard and unequal bargain.
Before we enter upon the proofs on this point, it may be well to ascertain, with some degree of exactness, the precise practical question involved in this charge of notice.
The estate of Van Pelt claims thirteen-twentieths of the vessel, on the ground that the funds of Van Pelt in his lifetime, and of his estate since his death, were furnished to the extent of this interest to build the vessel. The claim is for a latent equitable interest resting in the heirs or personal representatives of the intestate. The remaining interests in the vessel are not in question. It is admitted the other owners authorized the sale, and have received their share of the purchase money. The *377 case, therefore, is brought down to the single question, are the respondents chargeable with notice of this outstanding equitable interest in the vessel at the time of the purchase?
Our first remark is, that all the parties concerned in or connected with the purchase deny notice, and testify to the good faith of the transaction. Vanderbilt and Vail, who were concerned in the sale, and Deming and Todd in the purchase  four persons, each of unimpeachable characters.
This position is sought to be impaired by a critical examination of the testimony of Vanderbilt and Vail, who were examined on interrogatories, and isolated answers are seized on for the purpose of weakening the general denial, and establishing the fact of notice. We shall not go into the detail, but content ourself by stating that we have very diligently examined all the answers of these witnesses relied on in connection with the whole of their testimony on the subject, and they come to this  that the purchasers were advised there were parties in California who had advanced money towards building the vessel; that she was originally intended for employment in the waters of that State; that this purpose had been changed; and that they wished the boat sold, and that they, Vanderbilt and Vail, were authorized to sell her. Now this taken together furnishes neither notice of the equity of the estate of Van Pelt in the vessel to the purchasers, nor is it sufficient even to put them on inquiry. It must be recollected that the burden of proof rests upon the complainant. Taking the whole statement as true and entitled to belief, there is nothing in it to excite the apprehensions of even a prudent business man; for at the same time the purchasers were advised of advances or interests of persons in California, they were advised they had authorized the sale. One part of this statement was as much entitled to belief as the other. The case falls within the principle stated by Lord Lyndhurst in Jones vs. Smith, (1 Phillip, Ch. R., 244).
It must be remembered that this was not a purchase under a power of attorney, and hence a necessity to look to the power and see to the authority.
The purchase was from the apparent owner, possessed of all *378 the indicia of property, and the question is, whether this evidence of ownership is overcome by notice of an outstanding equitable interest in the vessel. The affirmative rests with the party charging notice, and the facts brought home to the knowledge of the purchaser to charge him with notice must be taken together, as the question is, what effect the evidence as a whole should have produced on his mind. Nor should it be forgotten that the persons who had advanced money to Vanderbilt had advanced it for the building of a vessel in his name and as his property.
The same observations are applicable to the testimony of Butler, a witness, who says, there appeared to be a question between the parties regarding the validity of the title to the boat; that Vanderbilt and Vail assured the purchasers that, independent of being builders of the boat, they were duly authorized by all the parties that might have any interest in her in California to sell her on the best terms. This witness does not profess to give the words of the parties, but only the substance of the conversation as he then recollected it.
The testimony of Spencer, who went to New York to become steward on the Adelaide, to the 12th interrogatory, says, "I understood from both Capt. Vanderbilt and Mr. Demming that John Van Pelt was part owner of the Adelaide;" and to the 15th, he answered, "they (Vanderbilt and Demming) both told me that the Adelaide was built to go to California; Captain Vanderbilt said they had entered into a combination out there, and the Adelaide was not needed; that they had boats enough out there to do all the business, and that this was the reason why they sold the Adelaide."
Now, the fact that the boat was built for parties in California, and that they had come to the conclusion she was not needed there, and wished her sold, did not necessarily detract from the right or authority of Vanderbilt to sell, who was invested with the legal title. If she was intended for sale, the presumption would not be an unnatural one that he was thus invested for the very purpose of a sale. As to the testimony of Spencer, that he "understood from both Vanderbilt and Demming that John Van *379 Pelt was part owner of the Adelaide." This is hardly evidence in a Court of Justice. It is the inference of the witness from conversation, instead of the conversation itself. It is not the evidence of a fact; a charge of perjury could not be predicated upon it if false.
Wood, another witness relied on to prove notice, beside the indefiniteness of his testimony, the conversation occurred nearly four years after the transaction; after also litigation had sprung up concerning the claim of the estate of Van Pelt. The suit in question was then pending against the respondents, and was naturally the subject of conversation and very easy of misapprehension. This witness also seems to have been in frequent communication with one of the parties in the Van Pelt interest. As a specimen of his testimony  "I asked Demming, I think, how the boat came to be sold here, and I think, Demming or Mayhew told me that a person by the name of Van Pelt owned her, who died in California. I don't know that he said Van Pelt owned her, but that owing to Van Pelt's death she was sold here."
This witness also says: "I understood from conversation I had with Demming and Mayhew that they had knowledge of the interest of Van Pelt or of that estate before the boat was purchased." We need not repeat this is not evidence. This is all the testimony on the question of notice that deserves any comment. We have seen that Van Pelt in his lifetime, and his legal representatives since his death, have studiously concealed their interest in this vessel in the city of New York, and for this purpose caused her to be constructed and finished in the name of Vanderbilt, and, after the appointment of another agent, Vail, to take charge of her after completion, the interest was still to be concealed in his name, thereby holding out a third person as the ostensible owner from the beginning of her construction, till the sale took place in August, 1854. And, although we do not say these parties who have thus enabled their agents to impose upon the purchaser should be estopped from setting up their interest as against him, if he purchases with knowledge, yet we think, under such circumstances, it is *380 the duty of the Court to scrutinize the evidence with more than ordinary attention  the proof of knowledge should be direct and unequivocal. The parties here seeking to prove the knowledge assume a position in contradiction to their past conduct, and are not entitled to the most favorable consideration of the Court. They are endeavoring to charge knowledge of a fact upon third persons or the public, when their interests become concerned, which they had down to the sale industriously concealed.
Some observations have been made upon the circumstances under which the vessel left the port of New York for the East, as tending to impeach the good faith of the purchasers. The proofs on this subject leave no such impression on the mind of the Court. The vessel had been purchased to fill a vacancy on a line of steamboats, and a delay of some ten days had occurred beyond the time fixed for her completion, which reasonably explains any impatience on the part of the purchasers in leaving for the city of Boston. Certainly, the fear of arrest can hardly be inferred from their anxiety, as the vessel was equally exposed to one in the latter city as in the former.
Without pursuing the case further we are satisfied that, upon a full examination of the proofs on the question of notice, they fail to impeach the bona fides of the purchasers, and as the legal title passed, the complainant has failed to establish any right to relief; and, we may add, we are not sorry that we have come to a conclusion in favor of the innocent party who has acted upon the evidence of the legal title of the party from whom the purchase was made against the other innocent party, who had not only been instrumental in furnishing this evidence but has industriously concealed his own, and thus turned the equity of the case against him.
The decree below reversed.
Mr. Justice CLIFFORD, dissenting:
I cannot concur in the opinion just pronounced; and inasmuch as the case is one of importance to the parties, I think it proper to state the reasons of my dissent. Appellee claims title to thirteen-twentieths of the *381 steamboat described in the bill of complaint, as administrator of John Van Pelt, late of San Francisco, in the State of California, deceased. He was the complainant in the Court below, and his claim is based, in the bill of complaint, upon the ground that the money to build thirteen-twentieths of the steamer was furnished by his intestate in his lifetime, or was paid out of his estate since his decease, to redeem certain personal property belonging to the estate which had been pledged by the decedent while in full life to furnish credits to construct and complete the steamer. Title to the whole steamer is claimed by the respondents in their answer by virtue of a purchase made by their agent on the 9th day of September, 1854, of one William W. Vanderbilt. John Van Pelt, on the 1st day of May, 1853, employed William W. Vanderbilt to make a draft for a steamer which he proposed to build in the City of New York, to be employed in navigating the waters of California. Vanderbilt made the draft as requested, and Van Pelt about the same time proposed to him that he should proceed to the City of New York as his agent, and there contract for and superintend the building of the steamer. Prior to that time he had been in the employment of Van Pelt as an engineer in navigating steamers on the waters of the former State. Connected as Van Pelt was, with such navigation, he did not desire that it should be publicly known that he was about to build a steamer of the description mentioned to come to California; consequently, it was arranged between him and his agent that the latter should immediately proceed to the City of New York and make the contracts for the contemplated steamer in his own name, and Vanderbilt testifies that he was to enter the steamer, when completed, at the Custom-house in New York as his vessel, unless he was otherwise ordered by his employer. According to the arrangement as then made the steamer, when completed, was to be sent to California and there wholly transferred to the principal, unless the agent should decide to become interested in her to the extent of two-twentieth parts as it was then contemplated he might do. Full proof is exhibited that Van Pelt advanced $20,000 to his agent towards the enterprize before any of the contracts were actually made *382 for the building of the steamer; $12,000 of that sum was advanced in the month of May, 1853, before the agent sailed for New York, and the balance was duly forwarded to the agent and received by him before any of the payments fell due under the construction contracts. On the 7th day of July, 1853, the agent made the contract with Lupton and McDiarmid to build the hull of the steamer for the sum of $20,000; $5,000 were to be paid when the keel was laid, $5,000 when the vessel was in frame, $5,000 when she was planked and her deck laid, $2,500 when she was launched, and the balance of $2,500 when the carpenter-work was finished. Separate and wholly independent contracts with other parties were made by the agent for the engine, joiner-work, and painting. Payments under all the contracts were to be made by instalments "as the work progressed," and in all, except the one first mentioned, it was expressly stipulated that the work should be done to the satisfaction of Vanderbilt. Van Pelt wrote to him on the 1st day of September, 1853, directing that the steamer, when completed, should be registered as follows, to wit: ten-twentieths in the name of D.P. Vail, four-twentieths in the name of Richard Chenery, three-twentieths in the name of R.M. Jessup, two-twentieths in the name of William W. Vanderbilt, and one-twentieth in the name of Frank Johnson. Other correspondence took place between these parties which shows to a demonstration that Vanderbilt was merely the agent of Van Pelt, in contracting for the building of the steamer, and that the original instructions in respect to the registry of the steamer were wholly superseded. When the enterprize was projected Van Pelt had expected to visit New York before the steamer was completed, out his health failing in September, 1853, he was obliged to abandon that intention, and for that and other reasons determined to make some new arrangement in respect to the steamer. Having come to that determination, he sent for Richard Chenery, who, accordingly visited the decedent at Sonoma where he was then sick, and they made an arrangement in respect to the subject-matter of this controversy. Under that arrangement Chenery for himself and R.M. Jessup, took seven-twentieths of the *383 steamer, and it was agreed that he should have the entire control of the business. Pursuant to that arrangement Chenery paid to Van Pelt seven-twentieths of the $20,000 which the latter had already advanced to build the steamer, and by pledging property they procured a letter of credit on Page, Bacon & Company for an additional sum of $50,000, to be expended in her completion. They also appointed D.P. Vail as their agent, and sent him to New York to adjust and pay the accounts and close up the concerns growing out of the building of the steamer. He took with him the letter of credit and proceeded to New York, but on the 29th day of the same September John Van Pelt died.
Administration was granted on his estate in California in October, 1853, and when closed, it appeared that there was $70,000 for distribution among his heirs, exclusive of his interest in the steamer now in controversy. Thirteen-twentieth parts of the steamer were built from moneys advanced by John Van Pelt, or procured from credits furnished by him in his lifetime, as fully appears by the accounts adjusted and paid by his administrators, and duly presented and allowed in the Probate Court. $48,194.57 were paid by his administrators to redeem the property pledged to procure the before-mentioned letter of credit, and the whole amount so paid by them was expended in the construction of the steamer. $13,000 had been advanced by Van Pelt in his lifetime, as before explained, and the two sums exceed thirteen-twentieths of the cost of the steamer by more than a thousand dollars. Vail proceeded to New York, pursuant to his appointment as agent of Van Pelt and Chenery, but as all the contracts had been made in the name of Vanderbilt, he continued to superintend the completion of the steamer.
Contractors for the hull agreed to complete the same in four months from the seventh day of July, 1853, and the evidence shows that the hull was launched and delivered to Vanderbilt in December following. She was built in Green Port, and after being delivered, she was taken to New York, and in a few days after her arrival there, the proper contractors commenced to put in her engines. More than $56,000 were expended in her construction *384 and equipment, in addition to the sum of $20,000 paid to the builders of the hull. Builders of the hull were paid in full according to the contract, and they delivered the same to Vanderbilt in December, 1853, without reservation or condition.
1. Having received their pay in full, and delivered the vessel without reservation or condition, of course they retained no interest which they could afterwards convey to any one. They built the hull only, and never had any interest, title or claim, in the entire vessel, or in the $56,000 expended for her completion after such delivery. Where an entire vessel is agreed to be built by a contractor, no property vests in the party for whom she is built until she is ready for delivery, and has been accepted or approved by such party. Mucklow vs. Mangles, (1 Taun., 318); Stringer vs. Murray, (2 Barn. & Ald., 248); Merrit vs. Johnson, (7 Johns., 473); Abbott on Ship, p. 5.
But that rule does not prevail where the vessel is constructed under the superintendence of the party for whom she is built, or his agent, and payments for her, based upon the progress of the work, are to be made by instalments, as the work is done. In such cases the person for whom the vessel is built is regarded as the real owner by all the well-considered decisions upon the subject. Woods vs. Russel, (5 Barn. & Ald., 442); Atkinson vs. Bell, (8 Barn. & Cress., 277); Clarke vs. Spence, (4 Ad. & Ell., 448); Laidler vs. Burlinson (2 Mee. & Wels., 602); Chitt. on Con., (10th ed.,) p. 401; Andrews vs. Durant, (1 Ker., 40). Vanderbilt acquired no title by the delivery of the steamer, for the reason that he furnished no money to pay the contractors, and in accepting the same he acted as the agent of those whose money was invested in the enterprise. He took no written conveyance at that time, and the whole evidence shows that he did not then contemplate any fraud upon the rights of those he represented in accepting the delivery. Builders never had any title, because the work had been performed under the superintendence of the agent, and by the terms of the contract the consideration was to be paid, and was in fact paid by instalments, as the work was done.
2. Suppose it had been otherwise, however, it must still be *385 conceded, I think, that no title remained in the builders of the hull after the reception of the consideration, and the unconditional delivery of the steamer under the contract. Title, therefore, must have vested in those who furnished the means to build the vessel, unless it be held that it was in abeyance, which no one will assert. Assuming the facts to be so, then it is clear that the case falls within the rule that when an agent acquires property in his own name by the use of the funds of his principal, it thereby becomes the property of the principal by operation of law. Scott vs. Surman, (Willes R., 400); Taylor vs. Plummer, (3 Maul & Selw., 574, 578); Thompson vs. Perkins, (3 Mason, 235); Story on Ag., sec. 231.
None will deny that title to a ship or vessel may be acquired by building or by purchase; and it is equally clear that it may be established, especially when acquired in the former mode, without the exhibition of any bill of sale or other written evidence. Authorities in this country are abundant to show that the title of a vessel may pass by delivery under a parol contract Bixby vs. Franklin Ins. Co., (6 Pick., 86); U.S. vs. Willings (4 Cran., 55); Badger vs. Bank of Cumberland, (26 Me., 428). Windover vs. Hogeboom, (7 Johns., 308); Vinal vs. Barret, (16 Pick., 401); Leonard vs. Huntington, (15 Johns., 298); Thorn vs. Hicks, (7 Cow., 699; Pars. Mer. L., 329); Stacy vs. Graham, (3 Duer, S.C., 452); Lord vs. Furgerson, (1 Mason, 317). Thirteen-twentieths of the steamer vested in the estate of John Van Pelt in December, 1853, when the builders of the hull delivered the same to Vanderbilt.
3. When that delivery was made, Vanderbilt had no muniments of title whatever, and did not commence to procure them until the 7th of April, 1854, and, in the meantime, $56,000, in addition to what had been paid for the hull, had been expended upon the steamer, and the estate of the complainants' intestate paid thirteen-twentieths of that sum to redeem the property, pledged by the intestate in his lifetime, as before explained. Attention to dates is important on this branch of the case, in order to ascertain when and by what means, if at all, Vanderbilt acquired what is called an apparent legal title. Importance *386 must be attached to the inquiry as to dates, because the opinion of the Court admits in effect that the title in fact, as between the respondents' grantor and the legal representatives of the deceased, was in the estate of the decedent; and it is difficult to see how the admission could have been withheld, as four months intervened after the builders surrendered all pretense of title before any writing of any kind was procured furnishing any color to any such ground of defense. When it is said that Vanderbilt had the apparent legal title, reference is made, I suppose, to the bill of sale from the builders of the hull, to their certificate as master carpenters, and to the enrollment of the steamer at the custom-house. These several papers, it seems, are regarded as constituting what is called an apparent legal title in Vanderbilt; but if they do, it will be seen that they became such by a fraud as base and transparent as was ever perpetrated by a living man upon a dead man's estate. Bear in mind that Vanderbilt was virtually superseded when the new agent was sent to New York to settle the accounts and close the concerns. His subsequent services were rendered as a sub-agent under David P. Vail; but, whether so or not, his agency under his first appointment terminated on the 29th of September, 1853, when John Van Pelt died. He then had no muniments of title, apparent or otherwise, and the whole evidence shows that he never became the agent of the heirs, or legal representatives of Van Pelt's estate. To make up the supposed apparent legal title, his first step was to induce the builders of the hull to give him a bill of sale of the whole steamer. What inducements were held out to them to give the bill of sale does not appear; but it does appear that, on the 7th day of April, 1854  four months after they had delivered the hull without reservation or condition  they gave him a bill of sale of the whole steamer, in consideration of $20,000, as therein expressed with covenants of general warranty applicable to the whole interest and value of the steamer. They generously conveyed not only what they built themselves, but all that was built by others, and warranted the whole to the grantee. Speaking of the sale of a ship, Chancellor Kent says the general rule is that no person can convey who has no title, and the mere fact of *387 possession by the vendor is not of itself sufficient to give a title. 3 Kent Com., p. 130; Williams vs. Merle, (11 Wend., 80.) Observe that the hull was unconditionally delivered by the builders four months before the date of this bill of sale, and it is very evident that after such delivery they retained no interest in the hull or any part of the vessel which they could convey to any one; and they never had any pretence of interest in the engine or the other materials added to the steamer between the time of the delivery and the date of their bill of sale. When that bill of sale was given, no builder's certificate had been filed in the custom-house; but on the 22d day of May following, the builders of the hull filed in the proper office a certificate in the usual form, certifying that the steamer had been built by them at Green Port, in 1854, and that William W. Vanderbilt was the owner. Such a certificate has the effect to show that the vessel was built in the United States, and that she is entitled to be registered as such, and it is required to be filed before the vessel can be registered or removed from the district where built to the district where the owner resides. Act Dec. 31, 1792, sec. 4, 1 Stat. at Large, 289.
4. Certificates given by master carpenters as a compliance with the registry acts are required for certain specified purposes, but they are not instruments of conveyance and cannot properly have the effect, or be so construed as to vest any interest in the person holding the same, as the owner of the vessel, beyond what he has by virtue of some other valid, legal title. Unless these two instruments, taken in connection with the attending circumstances, constituted a legal title in the grantor of the respondents, then it is clear that he had none such, because they are all the muniments of title held by him on the 3d day of August, 1854, when he contracted to sell the steamer to Wm. Deming and Wm. Todd, the agents of the respondents who made the purchase. Conveyance of the steamer, however, was not made by him until the 9th day of September following, and on that day she was enrolled at the Custom-house in his name. Doubts had arisen in regard to her title, and the purchasers and seller respectively employed counsel to make the title satisfactory *388 at the custom-house, which resulted in procuring an enrollment Saturday evening just before the custom-house was closed. Written notice in behalf of the legal representatives of John Van Pelt was given to the Collector of New York on the 22d day of June, 1854, informing him that Van Pelt at his death was the owner of thirteen-twentieths of the steamer, and requesting that she might not be registered or enrolled, or any transfer of her entered at the custom-house without notice to them, but it does not affirmatively appear that the agents of the respondents had any knowledge of that paper. Registry acts are to be considered as forms of local or municipal institutions for purposes of public policy. They are imperative only upon voluntary transfers of the parties, and do not in general apply to transfers by act or operation of the law. 3 Kent. Com., 9th ed., 208. Of itself, the registry it is said is not evidence of property unless it be confirmed by some auxiliary circumstances to show that it was made by the authority of the person named in it, who it sought to be charged as owner. Without such proof, Courts of Justice have expressed strong doubts whether it was even prima facie evidence of ownership. U.S. vs. Brune, (2 Wall, jr., p. 264); Tinkler vs. Walpole, (14 East, 226); Melver vs. Humble, (16 East, 169); Fraser vs. Hopkins, (2 Taunt, 5); Sharp vs. United Ins. Co., (14 Johns, 381); 1 Greenl. Ev., p. 494. Upon the same ground and for the same reasons it is competent for the real owner who claims as builder to show by parol evidence that his claim is well founded, and that the builder's certificate and registry or enrollment were fraudulently made and issued in the name of another. Such fraudulent acts cannot convey any interest in the vessel, and if not then a claimant whose title has no other foundation cannot convey a good title as against the real owner even to a purchaser without notice, because he cannot convey a title to that which he does not own. Williams vs. Merle, (11 Wend., 80); Everett vs. Coffin, (6 Wend., 609); Prescott vs. Deforest, (16 Johns., 169.)
5. But suppose it to be otherwise, and that the legal title to the steamer was in Vanderbilt at the time he and Vail gave the bill of sale to the agent of the respondent, still the complainant *389 as it seems to me, is entitled to recover in this suit on the ground that Vanderbilt held the title in trust for the legal representatives of John Van Pelt, and that the agents of the respondent had notice of the defect of title in their grantor. It is admitted that as between the legal representative of Van Pelt and the grantor of the respondents, the title to the steamer was in the former, so that the only question on this branch of the case is that of notice, but it is said that direct and unequivocal proof of notice must be required. Nothing is better settled than the rule that a purchaser with notice of a trust stands in no better situation than the seller, and it is equally well settled that notice to the agent is notice to the principal. Com. Dig. Chan. 4, c. 5; Maddox vs. Maddox, (1 Ves., Jr., p. 62); Fulton Bank vs. New York and Sharon Canal Co., (4 Paige Ch. R., 127); Bank of Alex. vs. Seton, (1 Pet., 309). Purchasers with notice are bound in all respects as their vendors were, and have no greater right. Taylor vs. Stibbett, (2 Ves., Jr., p. 437).
6. Until a different rule is established by this Court, I must continue to hold that whatever puts a party upon further inquiry is sufficient notice in equity. Ordinary prudence is required of the purchaser in respect to the title of the seller, and if he fails to investigate when put upon inquiry, he is chargeable with all the knowledge it is reasonable to suppose he would have acquired if he had performed his duty. Hill vs. Simpson, (7 Ves., Jr., 170); Kennedy vs. Green, (3 My. & Keen, 722); (Com. Dig., Chancery, 4, c. 2; Smith vs. Lowe, (1 Atk., 489, 3 Sug. on V. & P., 10th ed., 471); Jones vs. Smith, (1 Hare, 43); Booth vs. Barnum, (9 Conn., 286); Pitney vs. Leonard, (1 Paige, Ch. R., 461); Carr vs. Hilton, (1 Cur., C.C., 390). Constructive notice is held sufficient, upon the ground that when a party is about to perform an act by which he has reason to believe that the rights of a third person may be effected, an inquiry as to the facts is a moral duty, and diligence an act of justice. Hence, says Judge Duer, in Pringle vs. Phillips, (5 Sand., S.C.R., 157); he proceeds at his peril when he omits to inquire, and is then chargeable with a knowledge of all the facts that by a proper inquiry *390 he might have ascertained. Hawley vs. Cramer, (4 Cow., 717); Williamson vs. Brown, (20 Law R., 397).
7. Applying these principles to the present case, I am of the opinion that the evidence to show notice is full and complete establishing the fact beyond all reasonable doubt. Respondent's agents, Deming and Todd, were examined as witnesses, and they deny that they heard that any parties in California other than their grantor had any right or interest in the steamer, but the fact is proved to have been otherwise by six or seven witnesses, whose depositions are in the record. Their grantor, Vanderbilt, was examined as a witness, and the respondents asked him whether in the negotiations and interviews he represented himself as acting for any other person than himself, and he stated expressly that he represented himself as acting for himself, David P. Vail, "and the other owners." Responding to another interrogatory of a similar character, he said that he represented himself as acting for himself and parties in California who had advanced him money to build the boat, and as if to make it more emphatic and precise, he also said that he did state that parties in California had advanced him money to build the steamer Adelaide; and what is still more important, he also said that he so stated on board the Adelaide some time in August, 1854, and that they, the California parties, wanted the Adelaide sold to realize their money, as he had no other means of paying them. Communications so direct and specifie could not have been misunderstood, and the occasion last referred to undoubtedly was the one when the respondent's agents went on board the steamer to examine her on the day the contract of sale was made. When the last interview took place Vail was out of town, but Vanderbilt says he informed the respondents' agents that Vail represented some parties in California who had advanced money. Some delay occurred in consequence of his absence, but he was sent for and joined in the contract; and Vanderbilt says that he represented to them the position he occupied; that he represented that he was acting as the agent of parties in California who had advanced money for the vessel; and in conclusion, the witness says: "I always told them there *391 were parties in California who had advanced money for the steamer, but I have no recollection of telling them the names of the parties."
Vail was also examined as a witness by the respondents. He says it was mentioned at the time that he represented owners in California, and that he consented to the sale by authority of instructions from Mr. Chenery to that effect. Deming and Todd, as the witness stated, understood from Vanderbilt and himself that the vessel was built for parties in California, and that the reason she was sold was because the business had changed there so that the boat was not wanted. We told Mr. Deming, says the witness, that we were acting for parties in California, who wished the boat sold; and we did state that the Adelaide was built for parties in California. Both of these witnesses were examined by the respondents, and it is safe to say  there is no ground to suspect them of any partiality for the complainant. Other witnesses were also examined upon the subject, on the one side or the other, whose testimony is equally explicit. Complainant examined Carlos P. Butler, who wrote the original agreement. He says that there appeared to be a question between the purchasers and the sellers in regard to the validity of the title to the boat. Sellers assured purchasers that, independently of being builders of the boat, they were duly authorized by any party or parties that might have an interest in her in California, to dispose of her on the best possible terms. Want of confidence was evidently felt and manifested in what is now denominated the apparent legal title. Assurance were given that the persons proposing to sell had authority to sell from the real owners; but they exhibited no power of attorney to represent absent owners, or to sell the interest of the complainant's intestate, and no inquiries were made upon the subject. Witness says doubts were expressed as to the power of Vail and Vanderbilt to convey a good title, but Mr. Deming said he was perfectly satisfied with their statement. Their statement was, that they had authority independently of being builders of the boat; but no such authority was exhibited and no inquiries made in regard to it *392 although the witness states that it was spoken of by all that the steamer was built for parties in California.
Answer of respondent denies all such information, but the evidence proves it and falsifies the answer. Defence must rest where it is placed in the pleadings, and cannot now be shifted. Another witness, examined by the complainant, was John W. Marshall, who testifies that while Deming and Vanderbilt were negotiating on board the steamer, the latter said he wanted to see Captain Vail before he could do anything about selling the steamer, as he (Vail) had power to sell the boat; and the witness adds: Deming knew she was built for parties in California, as we talked about it before we came on. Reference should also be made in this connection to the deposition of John Spencer, who testifies that Vanderbilt and Deming both told him that the Adelaide was built to go to California to run on the Sacramento river; and he expressly states that he understood from both of them that John Van Pelt was a part owner in the Adelaide. Certain conversations between Deming and James Wood, who was examined as a witness, are also given in evidence by the complainant, to the effect that the former stated to the latter, in May, 1858, that the boat was built for parties in California; and the witness thinks that Deming, or the party who introduced him, stated that a person by the name of John Van Pelt, who died in California, owned the steamer. Complainant also refers to the conduct of Deming after the steamer was enrolled at the custom-house as tending to confirm the testimony, offered to show that he had knowledge that the title was defective, and, unless the ordinary rules of evidence are to be wholly disregarded, the circumstances proved are entitled to great consideration. Efforts to make the title satisfactory were not successful until Saturday evening, just before the time of closing the custom-house. While the negotiations for perfecting the title were going on, and only the day before they were closed, an agent of the heirs of John Van Pelt's estate arrived in the city of New York from California to look after this vessel. On his arrival he heard of the sale of the steamer, but having ascertained that she still remained at the wharf, and that she had not *393 been enrolled or inspected, he applied to the surrogate for administration on the estate. All this took place on Saturday; and that evening, after dark, Mr. Deming sent for Mr. Winchester, who had come on to take charge of the steamer as master, and directed him to have the smoke-pipe of the steamer painted that night, signifying at the same time that the steamer would sail on the following morning.
After his arrival in the city of New York, Winchester had acted as master of the steamer, but on Sunday morning William W. Vanderbilt took charge of her as master, and between seven and eight o'clock she sailed for Boston in a storm, when it blew so hard that she had to come to anchor at the mouth of the sound. Whether Deming knew the person who had arrived from California as the agent of the heirs does not appear, but it does appear that he was well known to the sellers of the steamer, and the circumstances afford strong ground to infer that the departure of the steamer was hastened as a means of discouraging further attempts to prosecute the claim. Taken as a whole, I am of the opinion that the evidence shows that the agents of the respondents had actual notice that the title of the sellers of the steamer was defective, and that she was built by monies advanced by parties in California; but at all events I am of the opinion that they had constructive notice that their grantors were not authorized to make the sale, and it is incomprehensible to me how any one who will read the record can come to a different conclusion.
Decree of the Circuit Court, I think, should be affirmed.
Mr. Justice MILLER:
I am of opinion that ten-twentieths of the steamboat Adelaide were owned by John Van Pelt in his lifetime, and that the legal title passed to his administrators in California.
That no sale of that interest could be made by those administrators, by the law of California, without an order of Court, and as no such order was made, there was no valid sale of that interest to defendants.
I have not been able to find anything in the case to take the *394 transaction between defendants and Vanderbilt out of rule of caveat emptor. I am of opinion, therefore, that the decree of the Circuit Court should be affirmed, except as to two-twentieths, which I think were the property of Vanderbilt, and one-twentieth the property of Frank Johnson, which, with the other seven-twentieths held by Chenery, passed to defendants by Vanderbilt's sale.