## NEW YORK COMMON PLEAS.

JOSE FRANCHERIS agt. DAVID M. HENRIQUES and THOMAS J. FERRIS.

Where the plaintiff in his complaint averred that Henriques was insolvent on the 17th Sept. 1857, and that by *fraudulently concealing* that fact from the plaintiff, and by *representing* to him that he was *prosperous* and *successful in business*, he led the plaintiff, on the 4th Sept., 1857, to consign to him $40,000 worth of segars:

And where the evidence of the plaintiff, among other things corroborative, disclosed that Henriques wrote to the plaintiff on the 17th Sept. 1857, saying that "business is good with me," and that "though money is very scarce, I do not

Francheris agt. Henriques.

suffer by it," and asking another large shipment of segars; and in *eight days* after such letter he failed, leaving $80,000 of indebtedness, upon his own showing, and $250 worth of effects to meet it, having by one stroke swept away the whole of the segars consigned to him by the plaintiff to pay $51,000 of indebtedness to members of his family,

*Held,* that upon such a state of facts, the plaintiff was entitled to *go to the jury* upon the question whether Henriques, by concealment and a false representation of his real condition, did not procure the shipment of the 4th of September to be made to him, neither expecting nor intending to pay for the goods, but designing to appropriate them in the way he did. The question was fairly raised, and it was a question of *intent,* which was not for the court, but the jury.

*New York General Term, November,* 1862.

DALY, BRADY and HILTON, *Judges.*

THE facts of this case will sufficiently appear in the opinion.

By the court, DALY, F. J. It is averred in the complaint that Henriques was insolvent on the 17th September, 1857, and that by fraudulently concealing that fact from the plaintiff, and by representing to him that he was prosperous and successful in business, he led the plaintiff to consign to him $40,000 worth of segars. That the representations were of the character alleged, sufficiently appears by Henrique's letters from the 17th of August to the 17th of September, 1857. Prior to that, on the 17th of August, 1857, the plaintiff shipped to him, from Havana, a large quantity of segars, amounting to $36,102. On the 4th of September, 1857, he made another shipment amounting to $33,234, and eight days before his failure Henriques wrote, hoping that he would have a good lot by the next shipment. On the 17th of August, 1857, he wrote, " I have money, but business is so dull that I am afraid to use it." On the 7th of September, that he had to pay a large sum in the month of August, but that it did not put him to any inconvenience. On the 12th, that the shipment of the 17th of August would turn out to be a very good one ; that the segars were selling very well, and that all his customers were in very good circumstances ; and on the 17th, he says that

"business is good with me," and that "though money is very scarce, I do not suffer by it." Eight days after, he failed. During all the time, he was heavily embarrassed. By his own showing he had, in the July preceding, confessed a judgment to his brother-in-law for the very large sum of $34.675, This was alleged to be for money loaned in sums of $15,000, $6,000 and $4,075, from the 29th of June to the 8th of July, the day when the confession was given. He was further, by his own showing, indebted to his brother-in-law in $6,213, and to his mother and his aunt in $10,487; $4,029 of which latter amount was for money loaned from his mother in the February preceding, and $6,468 for money loaned by his aunt three years before. On the 20th of September, the last of the two shipments of $33,234 arrived. Five days after, he transferred the bill of lading to his brother-in-law, the brother-in-law then being in Europe, and made a bill of sale to him of the whole shipment, to secure the debt before referred to, of $34,675, and on the same day he confessed a judgment to his brother-in-law for $6,458, for money deposited with him. On the next day, the 26th, he confessed a judgment to his mother, she then being in Europe, for $4,029, and a judgment to his aunt for $6,458; and on that day, the 26th day of September, 1857, four judgments were entered up to his brother-in-law, his aunt, and his mother, amounting in the aggregate to $51,000. On the same day, four executions were placed in the hands of the sheriff, and a levy was made upon the same day, by the direction of the attorney of Henriques, upon segars in his store and in the bonded warehouse. There was but $100 worth in his store. The rest was in the bonded warehouse, and consisted of the two shipments made by the plaintiff, less $15,659 of the first shipment, which Henriques had previously withdrawn. Ten days after, he made an assignment for the benefit of creditors, preferring seven creditors whose debts amounted to $8,741. No property passed under this assignment, except

outstanding claims consisting of protested paper and book accounts, amounting nominally to $100,000, but out of which the assignee realized only a very small sum, between $100 and $150. These claims and office furniture, worth less than $100, constituted, with the two shipments sent by the plaintiff, all that Henriques had at the time of his failure. The two shipments went to satisfy the judgment in favor of his brother-in-law, his mother and his aunt. What he had beyond these shipments to satisfy the creditors under his assignment, did not exced in value $150.

All that appeared in respect to the outstanding claims, amounting nominally to $100,000, was, that $10,000 of that amount had been due for six years, and $20,000 of it for two or three years; and that the remainder did not represent recent losses, is inferable from the statement of Henrique's brother, who was his clerk and assignee; that he knew of no particular losses he had met with between August and the 27th of September, except in the way of paying interest; that he paid a very large amount of interest between these dates, "heavier shaves" than he did before; and we have his own statement in writing in his letter to the plaintiff the day after his failure, that for the last three years he had met with very heavy losses in his business. His brother, in reply to a question to which the plaintiff objected, and which objection I think was well taken, said that all Henrique's embarrassments arose from the banks contracting their discounts. There was a serious commercial panic in New York, commencing with the failure of the Ohio Life and Trust Company on the 17th of August, 1857. To this he refers in his letter to the plaintiff, but declares that happily it did not put him to any inconvenience. This he says on the 7th of September, and on the 17th, (eight days before his failure,) he wrote that money was very scarce, but that he did not suffer by it. If any great and unexpected loss had occurred during the few days that intervened between that time and his failure,

which suddenly changed his situation, and compelled him to stop payment, it may fairly be inferred that an event so important would have been known to his brother, and would have been brought out upon his cross-examination.

We have, then, in the evidence, these facts : That for three years he had met with very heavy losses in his business ; that in July he was largely indebted, to an amount exceeding $51,000, and that he then confessed a judgment to his brother-in-law for $34,675 ; that from August to his failure, his clerk, brother and subsequent assignee knew of no particular losses he had sustained. That when he failed he had, in addition to what he owed to his brother-in-law, his mother and aunt, debts to the amount of $8,741 ; and how much beyond that, is not disclosed by his assignment, as that embraces only creditors of the first class, who were preferred. That his assets to meet this large indebtedness, leaving out the property shipped to him by the plaintiff from the 17th August to the 4th of September, was not worth $250. That after he had transferred the second shipment to his brother-in-law, Ferris, and executed to him a bill of sale for it, which he delivered to Ferris' agent, he made oath at the custom-house that he was himself the owner of the goods ; and though the consideration of the transfer and bill of sale was the $34,000 owing to Ferris, a judgment for the same debt was upon the same day entered, and a levy made under it upon the same property. That ten days before his failure, he drew out of the custom-house $15,679 of the first shipment; that the residue of it and the whole of the second was turned over to his relatives, to satisfy judgments confessed to them, and that eight days before all this was done, he wrote to the plaintiff, urging a further shipment, with a request to send him a good lot of fine specified brands of segars, declaring that business was good with him, and adding, " thank God, that though money is very scarce, I do not suffer by it, because my payments this month have been very light, and happily my

heavy payments took place last month ;" and the plaintiff, in pursuance of the request, having made the shipment, Henriques' brother, as his assignee, now claims it, and has commenced a suit against the plaintiff to recover the segars thus consigned ; to which may be added that which the letters of Henriques, written to the plaintiff during this period, abound in expressions of the greatest confidence and friendship. The plaintiff is not even placed among the preferred class in his assignment. The property con- signed by him from the 1st of August to the 4th of Sep- tember, has been disposed of by Henriques among his rela- tives, and the plaintiff, after $8,741 of preferred creditors, has the benefit of sharing in an estate the whole value of which is shown to be under $150.

This state of facts appearing on the part of the plaintiff, he was, in my judgment, entitled to go to the jury upon the question whether Henriques, by a concealment and a false representation of his real condition, did not procure the shipment of the 4th of September to be made to him, neither expecting nor intending to pay for the goods, but designing to appropriate them in the way in which he did. On the facts shown the question was fairly raised, and it was a question of intent, which was not for the court but for the jury. (*Smith* agt. *Acker*, 23 *Wend.*, 658.)

It is suggested that the business between Henriques and the plaintiff was one of long standing, and that the ship- ments were made in the regular course of business, without any new inducement being held out. It did not appear by the evidence whether the business was of long standing or not. It does appear that there were transactions before the two shipments referred to. It also appears that bills were drawn against each shipment, and that Henriques in each letter took occasion to refer to his circumstances ; to declare, eight days before his failure, that his heavy pay- ments took place before the panic ; that his payments in the month of September were very light ; that he did not

suffer by the scarcity of money; although his brother testifies that he paid "heavier shaves" in September than he did before; that he paid a very large amount of interest during that month to Moses Taylor and other wealthy men.

His letters convey, and it is apparent were intended to convey, the impression that he was wholly free from embarrassment. He writes on the 17th of August that he has money, but that business is dull and that he is afraid to use it. In another, that the stoppage of the banks put him to no other inconvenience except to lock up $3,500 of his funds; the fact being that he had in the July previous procured loans from his brother-in-law to the amount of $34,000; and that his brother-in-law, in making this loan, looked upon his affairs as very critical, is evident from his taking a confession of judgment, and from his instructions to his agent, to watch Henrique's business very closely, and if there was any danger of his failing, to put the judgment immediately in the hands of the sheriff, and take every possible method of securing the debt. This was long before the panic, and nearly three months before the banks stopped pay. The facts disclosed warrant the presumption that he was then insolvent; that though he might go on for some time by getting discounts, his condition was then irretrievable, except by what he calls a "brilliant operation." That he had been brought to that state by three years' very heavy losses in business, and that the shutting off of discounts merely accelerated a result that was inevitable. The prosperous or safe condition portrayed in his letter was not true. In eight days after the flattering letter to the plaintiff, of 17th of September, asking another large shipment, he fails, leaving $80,000 of indebtedness, upon his own showing, and $250 worth of effects to meet it, having by one stroke swept away the whole of the segars consigned to him by the plaintiff, to pay $51,000 of indebtedness to members of his family.

If the question had been submitted to the jury, and they

were of opinion that he obtained the $33,000 worth of segars, shipped on the 4th of September, with a preconceived intention not to pay for them; that he obtained them by designedly misrepresenting his real condition, the conclusion would be that he acquired no title, and that having none himself, he.could transfer none to the defendant Ferris. Nothing in such a case would pass by the indorsement of the bill of lading, the bill of sale, or by the seizure of the segars under the execution against Henriques. (*Mowrey* agt. *Welsh*, 8 *Cow.*, 238; *Ash* agt. *Putnam*, 1 *Hill*, 302.) It is suggested that the non-suit was right, the plaintiff having given no evidence to show that he was the owner, the presumption being that the goods belong to the consignee. The relation between the plaintiff and Henriques clearly appeared. The shipment was made against bills drawn upon Henriques in favor of the plaintiff. If the shipment was procured by fraud, this evidence was enough to show that the plaintiff was the owner.

I am not satisfied, moreover, even if the case is divested of the question of fraud, that the right of stoppage *in transitu* did not exist, but I forbear to discuss that question, deeming what is above stated sufficient to entitle the plaintiff to a new trial.