By the Court. Barrett, J.
The question whether Henriques obtained the goods with the preconceived idea not to pay for them, was properly submitted to the jury. Ferris was not a bona fide purchaser for present value; and the facts upon that head being undisputed, the question was one of law for the court. Such being the case, the request to charge that Ferris was not responsible if he took the goods in good faith and for a valuable consideration, must be viewed as a mere abstract proposition. I find, however, that the refusal to charge as thus requested was subsequently qualified, both generally and by a reference to the actual facts. This branch of the case was tried in substantial accordance with the'previ *253 ous ruling of the general term (24 How. Pr., 165), and is entirely free from difficulty.
The serious question, to my mind, is one which was there alluded to, but was neither passed upon nor discussed ; and that is, whether the goods had reached their final destination, so as to terminate the right of stoppage in transitu. The facts upon which its solution depends are these: On September 4, 1857, the goods were shipped upon the bark Lyra, by the plaintiff at Havana to the defendant Henriques at this port. The bill of lading and invoice were transmitted in due season, and reached Henriques before the twenty-first of the same month—the date of the arrival of the bark. Four days later, Henriques produced the documents at the custom-house, and had the goods entered in his name as importer. He took the usual owner’s oath, and gave security by bond for the payment of the duties, as prescribed by the warehousing acts and the treasury regulations. He then applied for storage to Messrs. Ward & Gore, the keepers of a bonded warehouse under the provisions of the act of 1854, and upon that firm agreeing to accept the goods he requested the collector to permit their deposit in such warehouse. He embodied in this request the appointment of an agent to have joint custody of the goods and possession of the keys of the premises, allowed to importers in pursuance of the acts referred to. The permit was granted; and accordingly, October 1, 1857, the goods were received in Messrs. Ward & Gore’s warehouse, where they remained until the sixth of the same month, when the attempt was made by the plaintiff to exercise the right of stoppage in transitu.
The question presented by these facts is new, and of importance to the mercantile community ; for while the general subject of stoppage in transitu has undergone much discussion, I am not aware that it has ever been deliberately considered with special reference to our present warehousing system, or to the effect of the acts of Congress upon which that system is based. The general rule is, that the right must be exercised while the property
*254 is still in its transit-, and that if it has once fairly arrived at its destination, so as to give the vendee the actual exercise of dominion and ownership over it, the right is gone (2 Kent Com., 545); and the idea that the goods must come to the corporal touch of the vendee is exploded (Dixon v. Baldwen, 5 East, 175; Foster v. Frampton, 6 Barn. & C., 107). It has, however, of late years been greatly favored, and even extended ; and justly so, for it is a beneficent right, based upon equitable and just principles, and therefore naturally springing from, and founded in equity itself (Wiseman v. Vandepupt, 2 Vern., 203). Its extension, nevertheless, has always been within the limits of the general rule, and has been accomplished without enlarging the rule itself, by a liberal, and, to the unpaid vendor, most favorable application of it to the facts upon which the existence of a state of transit rests. The plaintiff is entitled to the full benefit of all such considerations, but I am clearly of the opinion that, viewing the facts stated even in the extreme of this spirit, the right which he claims cannot be sustained without subverting one of the main purposes sought to be effected by the warehousing acts, or else changing the whole policy of the law, so as, upon the insolvency of the vendee, whether before or after delivery, to permit a general retaking of the property by the unpaid vendor. The provisions of the warehousing acts of 1846 and 1854 {Dunt. Laws of U. S., 1106, 1108, 1402, 1405 ; Bright. Dig., 385, 390) are broad and liberal. They confer upon the importer rights and privileges unknown to the narrow and imperfect system formerly in vogue both in England and in this country. He is thereby permitted, while the duties remain unpaid, to exercise every possible act of dominion and ownership over his goods (with the single exception of their withdrawal for home consumption), and he is compelled to bear the accompanying burdens. It is the importer who pays the fees of the custom-house officials for the entering and bonding of the 'goods. It is he who seeks a place for their storage, and the contract is therefore solely between *255 him and the warehouseman. Having paid the freight and procured the permit, he employs and pays the car-men who cart the goods from the vessel to his own chosen warehouse, where they remain, at his expense and risk, and subject, next after the lien for the duties, to his order, and to that alone. These duties he has already secured to the government by his bond with a sufficient surety, and thus a credit of three years has been acquired for their payment. If, under these circumstances, the existence of the right of stoppage in transitu depends upon the lien of the government, and only ceases upon the actual payment of the duties, and withdrawal of the goods for home consumption, then the continued transit becomes a mere legal fiction, and may extend over a period of three years beyond the termination of the voyage, and after that delivery which at least absolves the carrier from further duty or responsibility.
The great distinction, however, and the one upon '■ which my judgment mainly rests, between the ancient English system under which Northey v. Field (2 Esp., 613) so frequently referred to and so closely followed was decided, and that now under consideration is, that the former left the exclusive and absolute possession of goods, until the payment of the duties, in the government, while the latter vests the custody of bonded goods in the owner, importer, consignee, or agent, jointly with the officer of the customs (Act of March 28, 1854, Dunl. Laws of U. S., 1402). In the one case, the goods never, until their actual withdrawal, reached the possession, or becams subject to the authority of the importer. In the other, he obtains the actual though joint possession, and exercises dominion and authority, the government simply possessing a duplicate key to the warehouse, and, by the presence of an officer, preventing a fraudulent withdrawal. This dominion extends to a sale of the goods in bond subject to the lien of the government; and by such sale the importer transfers to his vendee the ownership of the goods, subject to the lien, and, jointly with the officer, their actual custody and possession. *256 ISTor is the importer confined to the general warehouses. He is at liberty to deposit the goods in his private warehouse ; and, for certain descriptions of merchandise, his own yard, vault, or cellar, may be constituted a bonded warehouse. It is another feature of the act that bonded goods may be transferred from warehouse to warehouse in the same or in different parts of the country, the importer paying as usual, the cost of carriage, and furnishing bonds for their faithful transportation to the permitted destination. Upon such transfer, the government abandons, for the time being, all physical custody, and relies entirely upon the transportation bond, and, perhaps, upon an additional bond from the carrier.
But this is not all. The goods may, at any time within the three years, be sold in a foreign market, free from the lien ; and their withdrawal under a permit for re-exportation, without the payment of any duties, is expressly provided for. Thus, the importer may keep the goods in his own private warehouse, at his own expense and risk, or he may transport them from place to place, both by sea and by land, and even through certain foreign countries, still at his own expense and risk, and through his own chosen carriers, and finally, upon re-exportation without the payment of any duties, obtain a release of the government lien, and a complete withdrawal of its joint custody.
Such are the rights and powers of the importer, upon the bonding of goods under these warehousing acts ; and they are clearly incompatible with the idea of a continued transit. The ability to exercise the rights pointed out, and their exercise in fact, are equivalent in principle, so far as the question of the termination of the transit is concerned. If, therefore, the right to stop exists upon the deposit of the goods in the bonded warehouse, whose proprietor is the agent of the importer, and where they remain at the latter’s expense and risk, it would also exist in his own yard, vault, cellar, or other private bonded warehouse; also after such new and additional impulses as he may have impressed upon them; and, *257 what would be still more anomalous, even upon their outward voyage in consummation of the foreign sale, and of the process of re-exportation referred to.
There is a plain distinction between the case of goods thus duly entered and bonded, and that of goods removed to the government warehouses under general orders. The effect of the former has been fully considered. The latter is based upon the non-appearance of the consignee, and the want of any claim of ownership. In that case, the goods are necessarily taken direct from the carrier into the possession of the government, where they remain, as was said in one of the cases, quasi in custodia legis, until the appearance of the unknown owner, and the proper assertion of his claim. Under such circumstances, it is perfectly apparent that the original purpose is not fully accomplished, and that the right to stop continues.
With a clear perception of this distinction, a brief examination of the authorities will suffice to remove any impression of their want of harmony with the views now expressed.
The first case upon the subject, and the one which is mainly relied upon by the respondent, is Northey v. Cragg (2 Esp., 613), to which an incidental allusion has already been made. That case comes plainly within the distinction stated. It was based upon an English excise law in force in 1797, which was totally dissimilar to these acts of 1846 and 1854. No credit was given ; no bonding or warehousing was permitted. Twenty days were allowed after the arrival of the ship for the payment of the duties, during which time the goods remained on board ; if not paid within that period, they were removed direct to the king’s cellars, where they remained for three months longer in the exclusive custody of the government, when, unless actually withdrawn in the mean time, they were sold to pay the duties. The fact in that case was, that the consignee had never entered the goods, nor claimed the ownership, and that at the date of his bankruptcy, the twenty days not having elapsed, the property still *258 remained on board the vessel (Abb. on Ship., 377, ed. of 1829 ; Steph. N. P., 2587). It was a nisiprius case, and Lord Kenyon held, and, in my judgment, correctly, that the right to stop had not terminated. With us, a removal under general orders is the only state of facts which could possibly present the slightest analogy to such a case; and that, as is freely conceded, does not work a termination of the transit.
Northey v. Cragg was followed by Lord EllenbonouGH, ten years later, in Nix v. Olive (Abb. on Ship., 377). The facts varied slightly, the consignee having transferred his right to the goods while they remained in the exclusive custody of the custom-house officers ; but as no entry had ever been made, either by the consignee or his transferee, and as neither of these parties had duly claimed the ownership, it cannot be said that any new or additional point was developed or ruled upon.
In Donath v. Broomhead (7 Pa. St., 301), the judgment was placed almost entirely upon Northey v. Cragg. The case, although decided in 1847, was not under the act of 1846, as the facts transpired in 1837. The goods were not entered, because of the loss of the invoice, and as in Northey v. Cragg, and Nix v. Olive, their removal direct to the custom-house was the consequence. It adds nothing to the English case, except an intimation that the entry would have entitled the vendee to a recognition of his right to ownership.
In our own State, the leading case is Mottram v. Heyer (1 Den., 483; 5 Id., 629), which also arose prior to 1846. This case is distinguishable from those cited in but one particular. There was a formal entry of the goods at the custom-house, unaccompanied, however, by the only act of ownership possible under either the English or American law prior to the establishment of the warehousing system,—the payment of the duties. Northey v. Cragg, and Burnham v. Windsor (5 Law Rep., 507), were strongly relied upon, but the supreme court held that the entry was an act of ownership which terminated the transit, and that the case then in hand was *259 thus plainly distinguishable from, all those in which that element was lacking. There is no evidence that this decision was reversed in the court of errors (5 Den., 629), as assumed in Harris v. Pratt (6 Duer, 626 ; 17 N. Y., 252). The judgment of the supreme court was affirmed, and affirmed generally. It is true that the chancellor put his vote for affirmance upon the ground that the right had not been properly exercised, and argued its existence, notwithstanding the entry. It does not appear, however, that this view of the case was concurred in by a majority of the senators, nor, indeed, by more than four. One senator delivered an opinion, holding, with Chief Justice Beoxsox, that the transitus was at an end ; but none of the other opinions for affirmance are given, nor is there any statement of the exact point upon which the vote centered. The decision of the supreme court must, however, be considered as practically reversed by the approval given to the chancellor’s opinion in Harris v. Pratt {supra), and I have analyzed the vote in the court of errors, not for the purpose of weakening the authority due to the chancellor’s individual opinion, in which, as an entirety, I fully concur, but really to add to its weight, and to fortify what in it may seem to be obiter dieta, by the strength of the subsequent approval. The case was decided in December, 1846, shortly after the passage of the warehousing act, and it was doubtless the inauguration of this system which evoked from the chancellor some remarks which I am about to quote, and which, although not necessary, as it must be admitted, to the decision of that case, are entirely applicable to the present, and are so expressive of the clear and evidently well considered opinion of an eminent jurist, whose general views upon the subject have merited the approval of the court of appeals, that I deem them entitled to almost the full weight due to the matters really decided.
“Where,” said the chancellor, “goods are placed in the public store, under the warehousing system, either in this country or in England, after a perfect entry of them for that purpose, they are to be considered as having *260 come to the possession of the vendee, at the place where he intends they shall remain until he gives further orders for them disposal. .... And in such a case, I have no doubt that the right of stoppage in transitu should be considered at an end the moment the goods are thus deposited, after a perfect entry for that purpose has been made.”
As an authority for his remarks, the chancellor refers to the case of Strachan v. Knox (noted in Brown on Sales, 536), which seems to be directly in point.
“There,” continues the chancellor, “the goods were imported, and were deposited by the consignee in a bonded warehouse, under the provisions of the statute (43 Geo. 3, c. 132), which statute was the commencement of the present warehousing system in England, and the court properly decided that the transitus was ended.”
In Harris v. Hart {supra), the entry of the goods (if made at all, which was doubted by Judge Demo in the court of appeals), was before their removal from the ship. It was a mere formality, unaccompanied by any of the acts necessary to effect a proper bonding. The vendees had not even received the bill of lading from the carrier, nor had they paid the freight. The latter facts were alluded to by Judge Woodruff in the superior court, as showing that Mottram y. Heyer was a stronger case in the vendee’s favor, and the judgment of both the superior court and the court of appeals upon the point was placed entirely upon the authority of the chancellor’s opinion.
Holbrotte v. Vose (6 Bosw., 76), cited upon the argument, is not in point. The right was there invoked, not by the original vendor, but by the importer as against his vendee. It is suggestive, however, in its clear recognition of the importer’s ownership and custody of the goods in bond, and of his right not only to dispose of them there, but to exercise the right of stoppage in transitu as against Ms tendee, while the goods remain in the carrier’s hands, under transportation bonds. From *261 these authorities, the following rules are fairly deducihle:
1. Where the goods are removed under general orders, in default of an entry, the right of stoppage in transitu is not terminated.
2. Where a formal entry is made, but is not followed up by proper bonding, the right continues.
2. But where there is a perfect entry, and the goods are thereupon regularly bonded and warehoused, the right ceases.
A new trial inevitably follows.
If the jury had been instructed under section 261 of the Code to find specially upon the question of fraud, this might have been avoided, for if such special finding had been favorable to the plaintiff, no prejudice to the defendants could have been worked by the ruling upon the other branch of the case. But as the record stands, with a general verdict for the plaintiff, how can we say that the judgment of the jury was not based upon the theory of the lawful exercise of the right of stoppage in transitu ? It was distinctly put to them, as a legal proposition, that the right had not ceased, and it was left to them, as a matter of fact, to say whether the notice asserting the right was served “under such circumstances and with such means that they could infer that it. reached the collector.”
This appeal was argued and submitted, and the above opinion prepared, upon the basis of there being merely a general verdict for the plaintiff. The verdict was rendered and recorded in the following form : “ Yerdict for the plaintiff for $-, on the ground of fraud.” Upon the argument the learned counsel treated these words “ On the ground of fraud” as surplusage, and consented to their being stricken from the printed cases ; and accordingly each of the judges then and there made such an erasure in the copy which had been handed up to him. Judge Brady, while concurring in my views upon the subject discussed, has arrived at a different result. *262 He thinks that these words should be restored—or rather, that we should ignore the consent and erasure, and consider the case solely upon the verdict as actually recorded. In this opinion I am inclined to concur ; but at all events that matter has been set at rest by the consent of the appellant’s attorney. The case, then, being treated from the standpoint of the verdict as recorded, I have no hesitation in agreeing to an affirmance; and I fully concur in the views entertained by Judge Beady with respect to the effect of such a verdict. The words “on the ground of fraud ” are to be treated as though they had read “on the issue of fraud and a special verdict to the effect that the defendant obtained the goods in question from the plaintiff by fraud is the fair paraphrase. There is no technical rule ; and if there were, it would be a blot upon the administration of justice, requiring us under such circumstances to shut our eyes to the finding, and, by treating the verdict as strictly general, to reverse upon a point which the jury themselves tell us that they never considered.
The judgment should be affirmed.
Brady, J.
In this case, there were two questions submitted to the jury — one of which was whether the shipment of goods in controversy was obtained by fraud, and the other whether the failure of the defendant Henriques did not authorize the plaintiff to stop the goods in transitu.
The jury were instructed that the disposal of the first of these questions in the affirmative wo'uld dispense with the necessity of their considering the second ; and they rendered a verdict for the plaintiff “on the ground of fraud,”—which was a direct finding on the first question, and rendered the consideration of the other unnecessary. In thus stating the result of their deliberations they made it apparent that they had passed upon the first question only, and no doubt remains upon that subject. If they had not done so, it would not appear which, if only one, of the questions, they had consid *263 ered, and leave us in doubt whether they had given the verdict to the plaintiff upon the right of stoppage in transitu, or upon the fraudulent acquisition of the property by the defendant Henriques, or both; and such doubt existing, the judgment would necessarily be reversed. As to the conclusions to which Judge Babeett has arrived in reference to the right of stoppage in transitu, they meet my entire concurrence.
It is true, as stated by him, that the counsel to this controversy agreed to” strike out the words “ on the ground of fraud ” from the case ; but we are not to be controlled by that circumstance. We have the right to examine the record, and to see whether or not the case is in accord with it, and consequently with the facts which the judgment of the court rests.
This is not a case in which the jury have added to their verdict an opinion or deduction, inference or conclusion, either of fact or law, but they have given the very substance of their deliberations in strict conformity to the charge of the presiding judge; and, unless the charge is erroneous in respect to the result of such a finding, the verdict ought not to be disturbed. If the finding of a jury begin with a direct verdict, and end with a special matter, or begin with special matter and end with a general conclusion upon it, the verdict will be judged according to the special matter; for in these cases the special matter makes the verdict, and overrules the general verdict (Foster v. Jackson, Hob., 53). If the jury, on the contrary, find facts not submitted to them, or which are not pertinent to the issue, and which they have no authority to find, the special matter will be rejected as surplusage, and the judgment will be given upon that part of the verdict upon which the regular issue is found (Bacon v. Callendar, 6 Mass., 304 ; Lincoln v. Hapgood, 11 Id., 358; Richmond v. Tallmadge, 16 Johns., 307).
In all cases the jury may give a general or special verdict, and the court ought to receive it, if pertinent to the issue (Anonymous, 3 Salk., 373); and this right has *264 not been abolished by any provision of the Code. It is true that section 260 defines what are general and what are special verdicts, but the requisites are the same as they were before the Code (Williams v. Williams, 7 Abb. Pr., 90). Holt, Ch. J., in the case in Sallceld, puts the right of the jury to render a special or general verdict, if pertinent to the issue, on the ground that they had doubt. Although they might refer to the court, they were not bound to do so. Upon the facts found, the court should pronounce judgment. The Code, section 260, defines a general verdict to be that by which the jury pronounce generally upon all or any of the issues, either in favor of the plaintiff or defendant; and a special verdict that by which the jury find the facts only, leaving the judgment to the court.
In this case, the jury found upon one of the issues, and their verdict is a general one, as defined by the Code. If there be any surplusage in the form of the verdict, it is in finding the amount due to the plaintiff. The special form which they adopted is a declaration that they found on the issue of fraud in favor of the plaintiff; and upon such finding it would have been the duty of the presiding judge, in consonance with his expressed views, to have ordered judgment for the plaintiff for the amount claimed, as the legal effect of such finding. The verdict is, however, wholly unobjectionable. It is not only pertinent, but directly responsive to one of the issues presented, and was properly rendered. The language employed by the jury is equivalent to saying, “Upon the issue of fraud we find in favor of the plaintiff,”—and we cannot disregard it without doing injustice to the plaintiff, and defeating the judgment of the jury, understandingly and fully expressed.
The charge, on the question to which the finding relates was correct.
The judgment should be affirmed.
Judgment affirmed.