The Executors of Catharine Halsted, deceased,

*v.*

Sarah H. Colvin, Albert S. Bigelow et al.

1. Where a mortgage, first in date and registry, embraces a mere privilege ·to buy certain land described in the mortgage for a specified price, but neither ·the mortgagor nor mortgagee pays the purchase-money, but the same is paid by the grantee of the land, who succeeded to the mortgagor's privilege . of purchase, out of money loaned to him on the security of the land, the privilege covered by the mortgage first in date ceased to exist when the land was conveyed to and paid for by another person than the person who executed ·the mortgage first in date.

2. Where one of two innocent persons must lose in consequence of the un-.authorized act or fraud of a third, he must bear the loss who caused the credit to be given which produced the loss.

3. Where one gives another power to practice a fraud upon innocent parties, ·the court will not interfere in his protection at the expense of those who have been deceived and misled by such fraud.

4. Actual possession of a negotiable instrument, payable to bearer, is plenary evidence of title in the possessor until other evidence is produced to control it.

5. If the owner of an unmatured bond, payable to bearer, puts the bond in the possession of a third person, he invests such person with the ordinary and ·usual evidence of title to that kind of property; and if the person thus held

out as owner deals with the bond as its owner in a transaction with a stranger, ignorant of the real facts, and a loss results, the owner, and not the stranger, must bear the loss.

On final hearing on bill, answers and proofs taken orally.

*Mr. Henry C. Pitney, Jr.,* and *Mr. William H. Vredenburgh,* for the complainants.

*Mr. J. Herbert Potts* and *Mr. Charles H. Voorhis,* for Sarah H. Colvin.

*Mr. Leon Abbett, Jr.,* for Albert S. Bigelow.

VAN FLEET, V. C.

This is a foreclosure suit. The question in dispute is one of priority. Two of the defendants claim that they hold liens on the mortgaged premises which stand prior in point of time and right to that of the complainants.

The transactions out of which this dispute has arisen may be stated in sufficient detail for present purposes as follows: The Union Brick and Tile Manufacturing Company, a corporation of the State of New York, executed a mortgage on lands and other property in this state, on the 18th day of December, 1885, to Albert S. Gallup, trustee, to secure the payment of one hundred and eighty coupon bonds—eighty for $500 each, and one hundred for $100 each. All the bonds bore even date with the mortgage. Their principal was payable January 1st, 1891, and carried interest from January 1st, 1886, at the rate of six per cent., payable semi-annually on the first days of July and January. They were payable to bearer, and were all sold or otherwise disposed of by the mortgagor. Part of the property put in pledge by the mortgage was a leasehold interest in about twenty-five acres of land, for a term of twenty years, commencing May 1st, 1882, with a privilege on the part of the lessee, the Union Brick and Tile Manufacturing Company, to purchase the land in fee for $7,000. Both the term and the privilege to buy were mortgaged. The lessee, in March, 1887, exercised its privilege

Halsted v. Colvin.

to buy and made a tender of the purchase-money, which was re-
fused, and shortly thereafter an action was brought to compel
the specific performance of the contract to convey. In March,
1887, Mrs. Sarah H. Colvin acquired fourteen of the bonds
secured by the Gallup mortgage, amounting together to $7,000,
and in the fall of the same year Mr. Bigelow acquired twelve,
amounting together to $2,000. Mrs. Colvin and Mr. Bigelow
are the two defendants who dispute the complainants' right to
priority. They insist that the Gallup mortgage, to the extent
of the bonds held by them, is entitled to priority over the mort-
gage on which the complainants' action is founded. In October,
1887, and after the suit for specific performance already men-
tioned had been brought, the mortgagor corporation, the Union
Brick and Tile Manufacturing Company, was adjudged insolvent
by this court, and a receiver appointed to take possession of its
assets and convert them into money.

Some time prior to September 21st, 1888, Chauncey Stillman
and John W. Ivery made an offer to the receiver appointed in
the case just mentioned, to purchase all the property in his hands
for $9,000, on condition that the trustee and the persons holding
the bonds secured by his mortgage would agree to relinquish cer-
tain of their rights. To effect the sale thus proposed, a contract
in writing was made on the date last named, which was signed
by Mr. Gallup, and purported to have also been signed by "the
owners and holders of all the bonds" secured by the Gallup
mortgage, by which it was, in substance, agreed, that if Stillman
and Ivery would purchase the property of the corporation in the
hands of the receiver and pay therefor the sum of $9,000, and
then organize a corporation with a capital of $200,000, divided
into two thousand shares of $100 each, and convey all the prop-
erty acquired by them from the receiver to such corporation,
then and in that case the time of payment of the bonds secured
by the Gallup mortgage should be extended on one-half for ten
years and on the other half for fifteen years, and that the rate
of interest on all the bonds should, after January 1st, 1889, be
four per cent. instead of six; and also that the lien of the Gallup
mortgage should be postponed and made secondary to a mort-

gage which the corporation, thereafter to be formed, should exe-cute on the property made over to it by Stillman and Ivery, to-secure the payment of $16,000, with interest; $7,000 of the $16,000 raised on this mortgage, it was agreed, should be applied to the payment of the purchase-money of the land then in litiga-tion; and until it was decided, whether or not it could be so applied, it was to remain in such safe custody as should be mutually agreed upon by Mr. Gallup and the mortgagor; and in case it was ultimately determined that it could not be so used, then it was to be applied to the payment of the $16,000 mort-gage. The contract also provided, that eighty shares of the stock of the new corporation should be issued in payment of the coupons of the bonds which were then matured, or which should mature down to January 1st, 1889, and should not be otherwise paid.

Stillman and Ivery performed their part of this contract. They purchased and paid for the property which, by the terms of the contract, they were to purchase and pay for; they organ-ized the Keyport Brick and Tile Manufacturing Company, and, on the 29th day of March, 1889, conveyed to that corporation the property they had acquired from the receiver of the Union Brick and Tile Manufacturing Company. The Keyport Brick and Tile Manufacturing Company, a short time after the con-veyance to it by Stillman and Ivery, was, by the order of this court, substituted as the complainant in the action for specific performance, and afterwards, and while that action was pending, procured a loan of $16,000 from William Elliott and secured its payment by a mortgage executed on the 1st day of August, 1889, on all its property. Seven thousand dollars of the money raised on this mortgage was, in compliance with the contract of September 21st, 1888, deposited with the Atlantic Trust Com-pany, and remained on deposit there until the final determina-tion of the litigation respecting the land which this sum was, by that contract, to be used to pay for, and was then, on the 9th day of July, 1891, on the conveyance of the land, pursuant to the decree of this court, to the Keyport Brick and Tile Manu-

Halsted *v.* Colvin.

facturing Company, applied in payment of the purchase-price of the land.

It thus appears that the fact is that, for the fee of the twenty-five-acre tract, the person who made the Gallup mortgage never paid a penny, never held its title, nor had an unconditional right to its title. It moreover appears, that the money which was used to pay for the land, and the payment of which imposed upon the person having the power to convey, the duty to convey, was the money of Mr. Elliott. His money paid for the land, and it was not until his money was in the hands of the person having power to convey, as a payment for the land, that it was possible for any lien to attach to the land superior to the lien for unpaid purchase-money. All that the Gallup mortgage attempted to convey in respect to the twenty-five acres, in addition to the mortgagor's term therein, was the privilege of buying the land for $7,000—it was not the land that was pledged, but the mere privilege of buying it—so that, until the mortgagor had, by paying for the land, acquired a right to a conveyance, his mortgagee could not, by force of his mortgage, have any lien whatever thereon. In a case of this kind, where the thing mortgaged is a bare right to buy for a specified price, and neither the mortgagor, nor the mortgagee, pays the purchase-money, but the same is paid by a subsequent mortgagee, on a conveyance, pursuant to judicial decree, to his mortgagor, who is another and different person from the first mortgagor, I know of no principle of law or rule of equity jurisprudence which will support a decree, adjudging that, as to the land thus acquired and paid for, the mortgage first in date stands first in order of priority. On the contrary, I think that as, in such case, the first mortgage covers a mere privilege to buy, subject to a condition that a specified sum shall be paid as purchase-money, and, as the mortgagor fails to perform that condition, it follows, both as a matter of correct logic and sound law, that when the land is, by force of a judicial decree, conveyed to and paid for by some other person than the mortgagor, the privilege mortgaged becomes extinct. Nothing, it seems to me, can be more certain than that until, in such a case, the privilege to acquire a title is transformed, by the

payment of the purchase-money, into a right to a title, no estate in the land, either equitable or legal, can vest in the mortgagor, and, until he has an estate in the land, it is impossible, under exising legal principles, for a mortgage made by him to grasp the land.

But this is quite aside from the complainants' main ground. They are the owners of the Elliott mortgage and also of a mortgage for a little over $1,100, made by the Keyport Brick and Tile Manufacturing Company on the conveyance to it of the twenty-five-acre tract, to its grantor, to secure a part of the purchase-money of that tract. The defendants admit that the mortgage last mentioned is the first lien on the twenty-five-acre tract. The real dispute in the case is as to the relative rank of the Elliott and Gallup mortgages as liens on a twelve-acre tract. This tract is covered by both mortgages. The complainants claim that the Elliott mortgage stands first in rank. This claim is based, of course, on the contract of September 21st, 1888. One of the main purposes of that contract was, as is plainly declared on its face, to induce some person, having money to invest, to lend $16,000 on what was made to appear to be an unquestionably good security, to a corporation to be formed thereafter, in order that such corporation might become the successor in property and business of the mortgagor corporation, which was then in course of liquidation as an insolvent corporation; and it is manifest that the hope was that, by this expedient, the land and works covered by the Gallup mortgage might be maintained as a living and active manufacturing property. At the time the contract was made, the situation was this: The property of the mortgagor corporation had been in the custody of a receiver, unsold and idle, for nearly a year. During all that time a suit had been pending to compel the specific performance of a contract to convey land to the corporation, but the receiver was without means to pay for the land in case a conveyance should be decreed. So that success in that suit, in the then condition of affairs, was more likely to increase than diminish the difficulties of the situation. It was manifest, to permit the property to continue to remain idle, and further delay its sale, must

Halsted *v.* Colvin.

result in constantly-increasing decay and deterioration, and that, unless some plan was speedily devised for its extrication from the perils surrounding it, a ruinous loss must ensue. The contract was made for this purpose—to rescue the property from its perilous position and preserve it for the benefit of the bondholders under the Gallup mortgage. The bondholders, in making the contract, yielded nothing which it was not believed would result, ultimately, in strengthening their security, for it will be observed that they simply waived their priority, under the Gallup mortgage, to a sufficient extent to enable the new corporation to raise money enough to acquire the property of the old and to pay for the land in litigation. It is obvious then, I think, that the condition of affairs existing, when the contract was made, presented very cogent reasons why the bondholders should not only be willing, but eager to assent to the contract.

But the two contesting defendants say that they did not sign the contract, nor assent to it, either in person or by an agent, and they consequently insist that they are not bound by it. This defence, so far as it is made by Mr. Bigelow, appears to be true. He acquired his bonds by purchase, as he swears, in the fall of 1887, nearly a year before the contract was made. He took possession of them when he bought them, and they have remained in his possession ever since. He did not sign the contract, and, so far as appears, never saw or heard of it while it was in course of execution. A person by the name of John T. Collins claimed, when he signed the contract as the owner of other bonds, to be the owner of those which it now appears were the property of Mr. Bigelow and in his possession. He signed, representing that he owned bonds to the amount of $9,500 ; he, however, produced only $7,500 ; the other $2,000, he stated, were temporarily in the possession of another person. The course pursued in executing the contract was this: When a bondholder came forward to sign, he was required to produce his bonds, and on their production, all the coupons, except those maturing on and after July 1st, 1889, were cut off; his bonds were then stamped across their face with these words, in red ink: " The payment of the principal of this bond is extended to Jan-

uary 1st, 1889 " (or, if for fifteen years, to January 1st, 1904), " interest, after the 1st day of January, 1889, to be four per cent. per annum." And after he had signed the contract his bonds were returned to him. Mr. Bigelow's twelve bonds are not stamped; the other one hundred and sixty-eight are. As the evidence now stands, there is not only a total failure of proof, going to show that Mr. Bigelow has waived any of his rights, but it is shown, on the contrary, that he has done nothing which can have the effect to degrade his debt from the rank which it held when his bonds were first issued. He is entitled to a decree directing that his debt be first paid out of the proceeds of the twelve-acre tract.

The defence of Mrs. Colvin rests on an entirely different state of facts. It is true, as she alleges, that she did not, in person, sign the contract of September 21st, 1888, nor authorize any person to sign it for her; but it is also true, that, when that contract was executed, her fourteen bonds were produced, stamped and signed for. Her right to the bonds arose in this way: In March, 1887, it became necessary for the Union Brick and Tile Manufacturing Company to raise $7,000, in order to, effectually exercise its right to buy the twenty-five-acre tract. It had no money and the time limited for it to exercise this right had nearly expired. The land had already been conveyed to another purchaser. At this juncture, three persons connected with the corporation consented to pledge bonds they held for a loan of $7,000 to the corporation. They were J. Warren Lawton, who furnished $2,000; John T. Collins, who furnished $3,000, and Henry W. Colvin, who furnished $2,000. The bonds were put in the hands of Henry W. Colvin to raise the money on them. He was a son of Mrs. Colvin and an officer of the corporation. Mrs. Colvin advanced $7,000 on the bonds, at the instance of her son, under a written contract, by which the corporation agreed, that the $7,000 should be used to pay for the land, and that immediately on its conveyance, the corporation should convey it to Mrs. Colvin, and she in turn agreed to lease it to the corporation for a term of years, at an annual rent of $920, payable quarterly, and also to convey it to the corporation at any

time within two years, on the payment of $7,000, together with such rent as should have accrued up to the date of the purchase. On these payments being made, the bonds were to be surrendered, not to the three persons who furnished them, but to the corporation. The $7,000 were not used to pay for the land, but were used to make an offer of payment. The vendor, however, having refused to accept, they were subsequently applied to other purposes. Though the money was advanced about March 23d, 1887, the bonds were not delivered to Mrs. Colvin and were never in her possession, but, from the time the money was advanced, they remained constantly in the possession of her son, Henry W., up to the time of his death in February, 1891. On the execution of the contract of September 21st, 1888, he produced his mother's bonds and stamped them as his own. Neither Stillman, Ivery nor Mr. Elliott, nor any person concerned for either, had notice, prior to the acquisition of their rights in the mortgaged premises, that Mrs. Colvin either owned or had any claim upon the bonds; nor had either knowledge of anything which made it their duty to seek further information before accepting the deed and mortgage made to them respectively.

These facts make it perfectly plain, as I think, that whether the contract of September 21st, 1888, was executed, in respect to the bonds of Mrs. Colvin, by her authority or not, she must be held to be bound by it, so far as the complainants are concerned. This result is inevitable, for the reason, that where one of two innocent persons must lose in consequence of the unauthorized act or fraud of a third, he must bear the loss who caused the credit to be given which produced the loss. Though the forms in which this principle has been expressed are somewhat variant, they all stand, in their substance, in almost perfect accord. Chief-Justice Holt, in *Hern* v. *Nichols, 1 Salk. 289,* said : " For seeing that somebody must be the loser by this deceit, it is more reason that he who employed and put trust and confidence in the deceiver should be the loser than a stranger." In *Fitzherbert* v. *Mather, 1 T. R. 12, 16,* Justice Buller said : " It is a common question every day at Guild Hall, when one of two innocent persons must suffer by the fraud or negligence of a third,

which of the two gave the credit." And then added, that, as it appeared in that case that the plaintiff had given the credit, he must take the consequences. And Justice Ashhurst, in the leading case of *Lickbarrow* v. *Mason, 2 T. R. 63, 70,* in stating the same doctrine, said : " Whenever one of two innocent persons must suffer a loss by the acts of a third, he who has enabled such third person to occasion the loss must sustain it." And in *Barnard* v. *Campbell, 55 N. Y. 456, 463,* the rule was laid down in this form : " That as between two persons equally innocent, a loss, resulting from the fraudulent acts of another, shall rest upon him by whose act or omission the fraud was made possible." This principle has been recognized by the courts of this state in the following cases : *Booth* v. *Wonderly, 7 Vr. 250, 255 ; Denton* v. *Cole, 3 Stew. Eq. 244; S. C. on appeal, 3 Stew. Eq. 732; Heyder* v. *Building Loan Association, 15 Stew. Eq. 403,* and *Lawson* v. *Carson, 5 Dick. Ch. Rep. 370.* The last two are so directly in point as to require special mention.

In *Heyder* v. *Building Loan Association,* the principal facts were : that a mortgagee had permitted his mortgagor to get possession of his mortgage and retain it for a considerable period. While the mortgage remained in his possession, the mortgagor criminally endorsed a receipt on it, showing that it had been paid, and then procured it to be canceled of record. Subsequently, the land which the mortgage had embraced was conveyed to a *bona fide* purchaser for value. The purchaser took title and paid his money, reposing full faith in the validity of the cancellation. On a bill filed to establish and enforce the mortgage, notwithstanding its cancellation, the court of errors and appeals held, that, in consequence of the mortgagee's negligence in allowing the mortgagor to acquire such dominion over the mortgage as enabled him to use it, with apparent authority, as a means of fraud, no relief could be given to him. Mr. Justice Knapp, who delivered the opinion of the court, stated the principle on which its judgment rested, in these words : " Where one gives another the power to practice a fraud upon innocent parties, the court will not interfere in his protection at the expense of those who have been deceived and misled by such

Halsted v. Colvin.

fraud." *Lawson* v. *Carson* is, in almost all its essential features, identical with the case just epitomized. The following were its main facts : A mortgagee attempted to enforce a mortgage which had been paid to a person with whom the mortgagee had entrusted the mortgage for safe keeping. This person had first been employed by the mortgagee to invest the money ; afterwards, to collect the interest and transmit it to her. He did this for two or three years. In the interval, the mortgagee had placed the bond and mortgage in his possession for safe keeping. Subsequently, the owner of the equity of redemption, desiring to pay the mortgage debt, went to the person having the custody of the papers and paid it. A receipt, showing payment, was endorsed on the mortgage, and the bond and mortgage were then surrendered, and shortly afterwards the mortgage was canceled of record. About two months after the payment, the person who received it absconded with the money. Vice-Chancellor Green, who heard the case, held, in an opinion evincing thorough consideration and careful discrimination, that, as the complainant had, by placing the bond and mortgage in the possession of this person, made it possible for him to show that he was clothed with apparent authority to collect the money due on them, and had thus put it in his power, by a breach of trust, to defraud either her or the mortgagor, she, and not the mortgagor, must, in obedience to the principle under consideration, bear the consequences of his fraud. It is obvious, that if this principle was ever applied so as to do justice, it was so applied in this case.

The difference between the instruments which were used as the means of fraud in the two cases just summarized, and those which were used for a like purpose in the case under consideration, is plain and radical. A mortgage possesses none of the distinctive qualities of negotiable paper. Its possession by any other person than the mortgagee or his assignee furnishes no evidence of title. On the contrary, the paper itself shows on its face that its possessor is not its owner. The title to a mortgage can only be transferred by assignment or by operation of law. But the bonds of Mrs. Colvin possessed all the attributes of commercial paper. They were payable to bearer and were,

therefore, transferable by simple delivery. Indeed, that is the ordinary, if not the universal, method of passing the title to such instruments. When the contract of September 21st, 1888, was executed, Mrs. Colvin's bonds were in the possession of her son, unmatured; they were, therefore, in a place and in a condition which justified any person dealing with her son, in respect to them, to believe that he was their true owner. With respect to such instruments, as was said by Mr. Justice Clifford, in *Goodman* v. *Simonds, 20 How. 343, 365,* and repeated by Mr. Justice Swayne, in *Murray* v. *Lardner, 2 Wall. 110, 121,* " the title and possession are considered one and inseparable—the possession of such paper carries the title with it to the holder." Even in cases where the possessor of such an instrument seeks to enforce its payment by suit, the settled rule is, as the supreme court of the United States has declared : " That possession without explanation is *prima facie* evidence that the holder is the proper owner or lawful possessor of the instrument, and that nothing short of fraud—not even gross negligence—is sufficient to overcome the presumption and invalidate the title of the holder, as inferred from his actual custody of the instrument." *Commissioners* v. *Clark, 94 U. S. 278, 285.* The same doctrine was laid down by the same court in *Collins* v. *Gilbert, 94 U. S. 753, 760,* in these words : "Actual possession of a negotiable instrument, payable to bearer, is plenary evidence of title in the holder until other evidence is produced to control it." The principle enunciated in these cases is well established and familiar. It was framed to give currency and protection to a class of securities found everywhere in the channels of commerce, and which represent a considerable part of the wealth of almost every business community. Public policy, as well as the security of private rights, demands that it should, in all cases, be maintained in all its vigor.

The evidence of ownership, arising from the possession of the bonds, remained precisely the same after Mrs. Colvin acquired an interest in them, as it did before. There was no change in possession. The bonds were never in her possession; she never clothed herself with the ordinary evidence of title to this class

Halsted v. Colvin.

of property. On the contrary, by committing the possession of the bonds to her son, and leaving them in his possession, uninterruptedly, for a long time, she invested him with such *indicia* of title as enabled him to show to the world, by the ordinary, evidence of title to this kind of property, that he was their absolute owner. Where the owner of ordinary merchandise, possessing none of the peculiar qualities of negotiable paper, does this, I understand all the cases, with entire uniformity, hold that he subordinates his rights in the property to those which may be acquired by a person dealing in good faith with the person thus invested with its apparent title. Mr. Justice Cowen, in *Ash* v. *Putnam, 1 Hill 302,* while expressing strong doubt whether *Mowry* v. *Walsh, 8 Cow. 238 ; Root* v. *French, 13 Wend. 570,* and *Rowley* v. *Bigelow, 12 Pick. 307*—in which it had been held that the *bona fide* purchaser of chattels from a fraudulent vendee acquired a title superior to that of the defrauded vendor—had been correctly decided, nevertheless said that, where the owner of a chattel transfers its legal title, with its possession, or invests its possessor with unequivocal *indicia* of ownership, he places himself in a position where he must be held to be estopped from contesting the rights which a person dealing in good faith with the possessor, has acquired in the chattel.

In consequence of the legal qualities of the bonds, it seems to me to be quite undeniable, that Mrs. Colvin, by leaving them in the possession of her son, under the circumstances stated, invested him by law, as to all persons who dealt with him in ignorance of her rights, with an apparently perfectly legal title to the bonds, and that she is in consequence bound, according to a highly-salutary principle of law, to bear the consequences of her son's fraud. Whether her son signed the contract of September 21st, 1888, for all her bonds, or he for a part, and Mr. Lawton and Mr. Collins for the other parts, is, in my judgment, a fact of no importance whatever. The bonds were in the possession of her son. He produced them as their owner and he cut off the coupons and stamped them. These were the essential and decisive acts of the transaction. They furnished such convincing evidence of ownership as to drive away all thought of

inquiry and to free even a distrustful mind from all doubt on that subject.

There is some evidence tending to show that Mrs. Colvin, by her acts, subsequent to the execution of the contract of September 21st, 1888, recognized and ratified that contract, but as the complainants' right to priority, on the ground already fully stated, seems to me to be entirely clear, it has not been necessary to consider and determine the effect of that evidence.